# EASTERN DISTRICT OF OKLAHOMA

JAMES L. DEROSA,     )
     )
         Petitioner,     )
     )
vs.     )     No. CIV-05-0213-JHP
     )
RANDALL G. WORKMAN, Warden,     )
Oklahoma State Penitentiary,     )
     )
         Respondent.     )

## OPINION AND ORDER

Petitioner, James L. Derosa, was convicted following a jury trial, in the District Court of LeFlore County, Case No. CF-2000-635, of two counts of First Degree Felony Murder. On both counts, the jury found both of the aggravating circumstances alleged: (1) that the murder was "especially heinous, atrocious, or cruel;" and (2) that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution."   In accordance with the jury's verdict, Petitioner was sentenced to death on both counts.  On direct appeal, the Oklahoma Court of Criminal Appeals affirmed his conviction and sentences. *Derosa v. State*, 89 P.3d 1124 (Okla. Crim. App. 2004), *cert. denied*, 543 U.S. 1063, 125 S.Ct. 889, 160 L.Ed.2d 793 (2005).

On March 26, 2004, Petitioner filed an Application for Post-Conviction Relief in Oklahoma Court of Criminal Appeals Case No. PCD-2002-624.  On May 3, 2004, in an

unpublished opinion, the court denied relief. Petitioner now seeks relief from his death sentence pursuant to 28 U.S.C. § 2254.

As a preliminary matter the Court notes that Randall G. Workman is currently the Warden at Oklahoma State Penitentiary. The Court finds, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Randall G. Workman is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record.

## I. RECORDS REVIEWED

This Court has reviewed (1) the Petition for Writ of Habeas Corpus and Attachments thereto; (2) the Response to the Petition filed by the State of Oklahoma; (3) the Reply to the Response filed by the Petitioner; (4) the Original Record from LeFlore County District Court, consisting of three bound volumes; (5) transcript of Initial Appearance held on October 9, 2000; (6) transcript of Formal Arraignment held on December 20, 2000; (7) transcript of Motion Hearing held on July 13, 2001; (8) transcript of Preliminary Hearing held on December 6, 2000; (9) transcript of Jury Trial held on October 15 - 18, 2001, consisting of three volumes of "Voir Dire," three volumes of "Testimony" and one volume of "Exhibits;" (10) transcript of Sentencing held on November 30, 2001; (11) Application for Post-Conviction Relief and Appendix of Exhibits thereto; (12) Order Denying Application for Post Conviction Relief and Application for Evidentiary Hearing; and (13) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this Court, including the briefs filed on Petitioner's behalf with the Oklahoma Court of Criminal Appeals in both the direct appeal and the post-conviction appeal, as well as other

miscellaneous pleadings. Although not listed specifically, all other items filed in this case have been reviewed. See Inventory of State Court Record, Docket No. 27, filed on June 22, 2007.

After a thorough review of the state court records, the pleadings filed herein, and the law applicable to the facts of this case, the Court finds, for the reasons set out herein, Petitioner is not entitled to the relief requested. Furthermore, Petitioner's request for an evidentiary hearing (Pet. at p. 135) is hereby denied.

## II. STATEMENT OF THE FACTS

Historical facts found by the state court are presumed correct, unless the petitioner rebuts the same by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Since Petitioner has failed to rebut the facts, as set forth by the Oklahoma Court of Criminal Appeals, this Court hereby adopts the following factual findings which were well summarized by the Oklahoma court:

> Around 9:00 p.m. on Monday, October 2, 2000, James L. DeRosa and John Eric Castleberry talked their way into the rural Poteau home of Curtis and Gloria Plummer and then robbed them, stabbed them, and cut their throats, leaving them dead on the floor. DeRosa and Castleberry then stole approximately $73 and left in the Plummers' tan 1998 Chevrolet pickup truck. The Plummers knew DeRosa, because he had previously worked for them on their ranch. He and Castleberry were apparently allowed into the home, which had a security system, on the pretense of looking for further work opportunity.
>
> DeRosa worked for the Plummers during the summer of 1999. He apparently began plotting to rob them sometime in the spring of 2000. Chris Ford testified that during March or April of 2000, while DeRosa was renting a room in his home, DeRosa approached him about an elderly couple in Monroe for whom he had worked. DeRosa said they would be an "easy target" and asked Ford to drop him off at their house, and then DeRosa would go in and rob them.

On Saturday, September 30, 2000, DeRosa brought up the idea of robbing the Plummers to Eric Castleberry and Scotty White. The three men were hanging out in a bowling alley parking lot that night, when DeRosa asked White if he would go with him to a house in Howe, which belonged to people for whom he had previously worked, and help him rob the owners. When White declined, DeRosa asked Castleberry, and Castleberry agreed. DeRosa claimed that the people "always carried a bunch of money on 'em."

Castleberry testified that he and DeRosa needed money in order to move to Corpus Christi, Texas, to find work. DeRosa spoke to Castleberry again the next day, and Castleberry again agreed to go into the house with DeRosa. They talked about using guns, but decided to use knives when they were unable to obtain guns.

On Monday, October 2, 2000, while DeRosa, Castleberry, and White were driving back to Poteau from Fort Smith, Arkansas (where they had been visiting a friend in the hospital), DeRosa told the others, "we're going to do it tonight." They agreed that White would drop DeRosa and Castleberry off at the house, where they would rob the Plummers and steal their old truck, and then White would meet them at the top of Sugarloaf Mountain, where they would abandon the truck. After attempting to track down Mavis Smith, a sister of the friend in the hospital, and getting pulled over for speeding, the men went to their various homes to prepare for the robbery. DeRosa obtained a white batting glove or golf glove from his home, but when he couldn't find "the other one," he got a sock to wear on his other hand. He told the others that he was going to get his mother's gun, but then decided against it, since it was registered in her name. Castleberry already had two knives in his car, and they decided to use those instead. Castleberry also had thick black rubberized gloves for himself in his car.

DeRosa gave White, who was by then driving Castleberry's car, directions to the Plummer home, and they arrived at approximately 9:00 p.m. DeRosa told White to check back in about ten to fifteen minutes, in case someone else was in the home. White did so, and after seeing lights on throughout the home and no sign of his friends, drove on to Sugarloaf Mountain. Meanwhile, DeRosa and Castleberry, who were not wearing disguises or masks, rang the bell at the Plummer home and were allowed in by Mrs. Plummer, in order to talk to Mr. Plummer about possible work opportunities. Mr. Plummer was in the den watching Monday Night Football. After chatting in their den for a few minutes, DeRosa pulled out his knife, held it to the neck of Mr. Plummer, and told him to sit still. When Mrs. Plummer grabbed the cordless phone and started trying to dial, Castleberry yanked the base of the phone out of the wall, pulled out his knife, held it to Mrs. Plummer's neck, and told her to sit still.

DeRosa stayed in the den with the Plummers while Castleberry began going through bedrooms looking for things to steal. While he was in the second bedroom he heard DeRosa yell for him to come back and help him. Castleberry ran back to the den and observed DeRosa, now standing near the door to the kitchen, struggling with the Plummers. Castleberry testified that he saw DeRosa stabbing at both of them and that he saw blood "all over" Mrs. Plummer. Castleberry also observed blood on the front and the side of Mr. Plummer and saw DeRosa stab Mr. Plummer in the chest.

Castleberry testified that he then went up behind Mrs. Plummer, stuck his knife to her throat, slit her throat, and pulled her backwards and threw her down on the loveseat. Castleberry then stabbed Mr. Plummer "a couple of times" in the back. DeRosa then pushed Mr. Plummer back toward the love seat and the television. Castleberry testified that Mr. Plummer picked up the cordless phone, which was on the floor, and begged the men to let him call an ambulance for his wife, saying he would give them anything they wanted if they would just let him get help for his wife. DeRosa responded by picking up a marble-topped end table and throwing it at him. The table hit Mr. Plummer on the head, and he fell to the ground. DeRosa then walked over and slit his throat, from ear to ear, and left him laying on the floor. Castleberry then pulled Mrs. Plummer down off the loveseat and left her facedown on the floor, near Mr. Plummer.

The men then began ransacking the house looking for cash and other valuables, but they found only Mr. Plummer's wallet and Mrs. Plummer's purse. DeRosa took the cash out of the wallet, and Castleberry dumped the purse onto the laundry room floor and took the cash. When they couldn't find the keys for the older white pickup parked outside, they decided to take the much newer, tan Chevrolet pickup that was parked in the garage. DeRosa drove the truck to the top of Sugarloaf Mountain, but decided not to leave it there, thinking they would be "too obvious." They met White on their way back down, DeRosa told White to wait for a few minutes and then meet them at the Poteau City Lake.

Castleberry testified that when they got to the City Lake, they "[p]ut the truck in the water and got in the water and rinsed the blood off us and changed clothes." White testified that as he pulled up, he could see the back of the truck and its taillights, as the truck sank into the lake. DeRosa and Castleberry put their wet, bloody clothing into a black plastic garbage bag and put on fresh clothing, from out of Castleberry's car. Castleberry testified that he put all of his wet clothing into the bag except his underwear, which he couldn't find, and that he threw his gloves and his knife into the lake. DeRosa put his knife into the bloody sock that he had worn on his hand and threw it into the water too.

The three men then got back in Castleberry's car, drove to Taco Bell, and bought themselves tacos using the money they had stolen. Before dropping White off later that night, Castleberry told White that they "ended up having to kill 'em." White was also told that Castleberry and DeRosa were leaving for Corpus Christi the next morning.

Castleberry and DeRosa later went to a campground area and burned the clothing in the garbage bag, after spraying lighter fluid on it. They were afraid that DeRosa's combat boots would not burn fully, so they dropped them over a bridge near Keota Landing. Later that night Castleberry told their friend Justin Wingo, in DeRosa's presence, that they had just killed two people and how they had done it. The next day Castleberry and DeRosa drove to Corpus Christi, Texas, to the home of Castleberry's father.

The Plummer bodies were discovered the morning of October 3, 2000. On the morning of October 4, 2000, Scotty White, who was eighteen years old and a high school senior at the time, informed a teacher at his high school that he knew who killed the Plummers. Later that morning he met with Sheriff Kendall Ballew and investigator Shawn Ward, in the principal's office, and told them that DeRosa and Castleberry had killed the Plummers, how they did it, what they did with the Plummers' truck, and that they had left for Texas. After the interview the officers discovered the truck in the Poteau City Lake, right where White said it would be.

Although White initially tried to minimize his own involvement, saying that the other men just told him about what had happened, the investigating officers were suspicious about the extent of his knowledge, and took him to the district attorney's office for further interviewing. Shortly after 1:00 p.m. that afternoon, after White was Mirandized, he told the investigating officers additional details about what had happened, including the fact that he had dropped the others off at the Plummer home. In a third interview, conducted after a break of only a few minutes (in order for White to look at an atlas), White told them that DeRosa and Castleberry had gone to Corpus Christi.

Castleberry and DeRosa were arrested by local officers in Corpus Christi, outside the home of Castleberry's father, that same evening. When the arresting officer informed DeRosa that he was being arrested on two counts of first-degree murder in an Oklahoma case, DeRosa said, "Yeah, I heard about what happened to those people. We had just visited 'em so my prints are probably out there." Sheriff Ballew and Shawn Ward arrived in Corpus Christi on October 5, 2000, to transport DeRosa and Castleberry back to Oklahoma. After being advised of his Miranda rights and agreeing to waive them, Castleberry agreed to talk with Ballew and Ward. Though he initially denied involvement in the Plummer killings, Castleberry then relented, and in

a tape-recorded interview, told Ballew and Ward essentially the same detailed story that he testified to at trial.

*DeRosa*, 89 P.3d at 1129-1133 (footnotes omitted).

## III. PETITIONER'S CLAIMS FOR RELIEF

The Petition (Dkt. # 17) filed herein on December 23, 2005 raises eleven (11) grounds for relief. On March 22, 2006, Respondent, by and through the Attorney General of the State of Oklahoma, filed a Response (Dkt. # 19) to the Petition. Petitioner filed a Reply (Doc. #22) on May 12, 2006. Specifically, Petitioner alleges the following errors entitle him to habeas relief: (1) ineffective assistance of counsel; (2) denial of change of venue motion deprived Petitioner of a fair trial; (3) errors occurring in jury selection deprived Petitioner of a fair trial; (4) prosecutorial misconduct; (5) improper comments of a witness deprived Petitioner of a fair trial; (6) the victim impact evidence violated Petitioner's constitutional rights to a fundamentally fair sentencing proceeding as guaranteed by the Fifth, Eighth and Fourteenth Amendments; (7) there was insufficient evidence to support the "avoid arrest" aggravating circumstance and this aggravator is unconstitutional as applied; (8) the trial court improperly defined "heinous, atrocious or cruel" aggravating circumstance; (9) the trial court's failure to instruct the jury that Petitioner had the right not to testify violated his Fifth, Sixth and Fourteenth Amendment rights; (10) the cumulative effect of the afore-mentioned errors deprived Petitioner of his constitutional rights under the Eighth and Fourteenth Amendments of the United States Constitution; and (11) Oklahoma's lethal injection protocols are unconstitutional.

# IV. STANDARD OF REVIEW

Since Petitioner filed his petition in December, 2005, this case is governed by the statute as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). See *Lindh v. Murphy,* 521 U.S. 320, 326-327, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).

The AEDPA made significant changes to federal habeas corpus law, specifically delineating the circumstances under which a federal court may grant habeas relief. Under the AEDPA's provisions, this Court is precluded from granting habeas relief on any claim adjudicated on the merits by a state court

> unless the adjudication of the claim—
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Furthermore, determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court interpreted the above-quoted statute holding, in order for a petitioner to obtain federal habeas relief, the petitioner must first demonstrate that his case satisfies the conditions set by § 2254(d)(1). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court case law or "if the state confronts a set of facts that are materially

indistinguishable from" a decision of the Supreme Court, but nonetheless arrives at a different result. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (citing *Williams,* 529 U.S. at 405-406). Whereas, the "unreasonable application" provision is implicated when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407, 120 S.Ct. at 1520. "The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S.Ct.1933, 1939, 167 L.Ed.2d 836 (2007), *reh. denied*, 551 U.S. 1177, 128 S.Ct. 7, 168 L.Ed.2d 784 (2007). Finally, the Supreme Court has made it clear that a state court is not required to cite Supreme Court case law, or even be aware of it, "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early*, 537 U.S. at 8, 123 S.Ct. at 365.

# V. PETITIONER'S ALLEGED ERRORS

## 1. Ineffective Assistance of Counsel

In his first ground for relief, Petitioner claims trial counsel's failure to fully investigate and present readily available mitigating evidence deprived him of his Sixth Amendment right to effective assistance of counsel and to a fair sentencing procedure. Respondent urges this Court to deny this claim for failure to exhaust the same in the state courts. In his reply, Petitioner argues the issue could not have been raised on direct appeal because appellate counsel was an active participant in Petitioner's trial team. Petitioner also claims the issue could not have been raised during a post-conviction proceeding because the Oklahoma Court of Criminal Appeals has consistently held that claims of ineffective assistance of counsel not raised on direct appeal are waived. Furthermore, in Petitioner's original post-conviction proceeding, the Oklahoma Court of Criminal Appeals held that all of the claims of ineffective assistance of counsel raised therein were barred as waived since they were not raised on direct appeal.[1] *See*, *DeRosa v. State*, Order Denying Application for Post-Conviction Relief and Application for Evidentiary Hearing, filed in the Oklahoma Court of Criminal Appeals on May 2, 2004, Case No. PCD-2002-624. As a result, Petitioner argues he "was unable to

---

[1] Petitioner argued in his post-conviction application that trial counsel rendered ineffective assistance because he (1) failed to object to the dismissal of prospective juror Treena Jackson, failed to try to rehabilitate Ms. Jackson and failed to make a record of questions he intended to ask to rehabilitate Ms. Jackson; (2) failed to object to the district attorney's efforts to unconstitutionally limit Petitioner's mitigating evidence during voir dire and at closing; and (3) failed to request the trial court to instruct the jury regarding Petitioner's right not to testify. Additionally, Petitioner argued appellate counsel was ineffective for failing to raise the following issues: (1) the death penalty required the state to present more reliable evidence to justify imposition of the ultimate penalty; (2) imposition of lethal injection under the protocols currently in effect in Oklahoma violates the Eighth and Fourteenth Amendments; (3) the trial court's failure to instruct the jury that the aggravating circumstances had to outweigh the mitigating circumstances beyond a reasonable doubt; and (4) the evolving standards of decency supports a finding that the punishment of death violates the Eighth Amendment's ban on cruel and unusual punishment.

have his claim of ineffective assistance of counsel considered by the State of Oklahoma."

Pet. at p. 21.

a. Procedural Bar

As a general rule, if a petitioner has failed to present a claim to the state courts in the manner prescribed by the procedural rules of the state, the state court may deem the claim defaulted. *Wainright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Where a state prisoner defaults his federal claims in state court based upon an independent and adequate state procedural rule, federal review of his habeas claims will be barred. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991). If the state court's finding is separate and distinct from federal law, it will be considered "independent." *See Ake v. Oklahoma*, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *Duvall v. Reynolds*, 139 F.3d 768 (10th Cir. 1998), *cert. denied,* 525 U.S. 933, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998). If the finding is applied "evenhandedly to all similar claims," it will be considered "adequate." *Maes v. Thomas*, 46 F.3d 979 (10th Cir. 1995), *cert. denied* 514 U.S. 1115, 115 S.Ct. 1972, 131 L.Ed.2d 861 (1995) (citing *Hathorn v. Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 2426, 72 L.Ed.2d 824 (1982)). Where the state-law default prevented the state court from reaching the merits of the federal claim, the claim ordinarily cannot be reviewed in the federal courts. *Ylst v. Nunnemaker*, 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991). "Review is precluded 'unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice.'" *See Breechen v. Reynolds*, 41 F.3d 1343, 1353 (10th Cir. 1994), *cert. denied*, 515 U.S. 1135, 115 S.Ct. 2564, 132 L.Ed.2d 817 (1995) and cases cited therein. As noted in *Jackson v. Shanks*, 143 F.3d 1313, 1317 (10th Cir. 1998), *cert. denied,* 525 U.S. 950, 119 S.Ct. 378, 142 L.Ed.2d 312 (1998), the procedural default rule is not a jurisdictional rule; rather, it is based upon the principles of comity and federalism.

The Tenth Circuit has held that Oklahoma's procedural bar will apply only where two conditions exist: 1) trial and appellate counsel differ, and 2) the ineffectiveness claim can be resolved upon the trial record alone. *English v. Cody*, 146 F.3d 1257, 1264 (10th Cir. 1998). Here, neither of the two *English* conditions were satisfied. Petitioner's appellate counsel was involved, although arguably in a limited fashion, as his trial counsel. Additionally, the claim relies heavily upon mitigation evidence gathered from additional sources after trial.

Prior to Petitioner filing his petition herein, however, the Oklahoma Court of Criminal Appeals recognized that the Oklahoma Legislature's amendment of the Capital Post-Conviction Procedure Act in 2004 effectively overruled the approach adopted by the Oklahoma courts in *Walker v. State*, 933 P.2d 327 (Okla. Crim. App. 1997), which had been repeatedly criticized by the Tenth Circuit Court of Appeals. *See Davis v. State*, 123 P.3d 243 (Okla. Crim. App. 2005). In overruling *Walker*, the Oklahoma court finally recognized that

> [r]equiring appellate counsel to evaluate his or her own performance and decisions at trial or forfeit a claim of ineffective assistance of trial counsel does not comport with *Kimmelman*[2] because post conviction applicants are not provided the opportunity to consult with separate counsel on appeal in order to obtain an objective assessment of trial counsel's performance. In light of

---

[2]*Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

12

> *Kimmelman*, we find that the importance of the Sixth Amendment compels us to consider all claims of ineffective assistance of trial counsel raised in a timely application for post-conviction relief and no longer apply a procedural bar when appellate counsel and trial counsel were the same.

*Id.*, at 245-246 (footnote added).

Upon issuance of the decision in *Davis*[3], a procedural mechanism existed, under Oklahoma law, for Petitioner to file a second or successive application for post-conviction relief to raise the ineffective assistance of counsel issues raised herein within sixty (60) days "from the date the previously unavailable legal or factual basis serving as a basis for the new issue is announced or discovered." *Id.*  *See also*, Rule 9.7(G)(3) of the Rules of the Oklahoma Court of Criminal Appeals.  Although Petitioner's counsel, on December 23, 2005, asked this Court "to return this matter to the State court to allow presentation of this claim under the new rules adopted by the Oklahoma Court of Criminal Appeals in *Davis*," Petitioner has never argued he was prevented from filing a successive petition with the Oklahoma state courts within 60 days of the *Davis* decision.  Furthermore, to the extent that Petitioner had almost completed the investigation of this claim, as evidenced by the affidavits supporting this issue on December 23, 2005, it does not appear Petitioner would have run into the same obstacles as those addressed in *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007).[4]  Therefore, this Court finds it would not have been futile for Petitioner to file a

---

[3]The *Davis* decision was issued on October 27, 2005.

[4]The only records Petitioner sought to discover, which were not in his possession at the time of his filing herein, were his military prison records.  Petitioner's Motion for Discovery (Dkt. 15), filed simultaneously with his Petition herein, indicated these records "could provide possible mitigation."  Further, the motion indicates the records could show that Petitioner received a commendation for bravery.  Yet, the motion makes clear that Petitioner was aware of this information at the time of trial and, therefore, he could have advised counsel of this information.  It is just as likely that, based upon what Petitioner told counsel, that counsel did not want to bring up Petitioner's military prison record in front of the jury.

second application for post-conviction relief under the particular facts of this case. Accordingly, this Court finds Petitioner has failed to exhaust this claim in the State courts.

b.  Merits of Claim

Assuming for purposes of argument that Petitioner's claim was not procedurally barred, this Court would find Petitioner is still not entitled to relief herein.[5] Petitioner's claim of ineffective assistance of counsel is governed by the familiar two-part test announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  First, the Court indicated that the defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms.  In order to establish that counsel's performance was deficient, Petitioner must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064.  Second, the defendant must establish that the deficient performance prejudiced the defense.  *Id.*  Failure to establish either prong of the *Strickland* standard will result in a denial of Petitioner's Sixth Amendment claims.  *Id.*, 466 U.S. at 696, 104 S.Ct. at 2069-2070.  While ensuring that criminal defendants receive a fair trial, considerable judicial restraint must be exercised.  As the Supreme Court cautioned in *Strickland*,

---

[5]Since this Court finds Petitioner's ineffective assistance of counsel claim has no merit, Petitioner's request to hold his Petition in abeyance so he may return to state court to exhaust this claim is denied.  *See*, *Rhines v. Weber*, 544 U.S. 269, 277, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005) (holding it would be an abuse of discretion for a district court to grant a stay to allow a Petitioner to exhaust his claims first in state court when the unexhausted claims are plainly meritless).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.*, 466 U.S. at 689, 104 S.Ct. at 2065. In order to establish prejudice in the guilt stage, the defendant has to show "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. While at the penalty stage of a capital case, the defendant must show "there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* In other words, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different," *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996), *cert. denied,* 520 U.S. 1122, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); so that, the "confidence in the reliability of the verdict is undermined." *Id.*

The United States Supreme Court has indicated that every effort must be made by a reviewing court to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 1065. In addition, the Court indicated the conduct of counsel is "strongly presumed" to have been within the wide range of reasonable professional assistance. *Id.*

In this case, Petitioner argues trial counsel failed to conduct a full investigation and failed to present readily available mitigating evidence. While there is no question that defense counsel could have conducted a more thorough investigation, this Court finds the "new" evidence which Petitioner claims should have been discovered and presented to his jury is cumulative to what was actually presented to the jury and/or contradicts the most compelling mitigating evidence heard by the jury . Specifically, Petitioner's jury was given an overview of his troubled childhood by his brother, Jason DeRosa,[6] his mother, Cassie DeRosa,[7] and his sister, Marlene Sharp.[8] This testimony included evidence that: (1) a few weeks after his birth, Petitioner's father stole approximately $1500 and took off without telling Petitioner's mother where he was going;[9] (2) Petitioner was deserted by his father when he was approximately 1-1½ years old;[10] (3) Petitioner was abandoned by family members no less than seven times, including being left at a daycare by his mother for approximately three (3) months when he was 2-3 years old;[11] (4) Petitioner grew up believing that he had no mother until he was seven years old; (5) Petitioner went to live with his stepfather at age eleven, but his stepfather died five years later; (6) Petitioner was abused by his mother, grandmother and stepmother and may have been sexually abused by his father;

---

[6] J.T. Tr., Vol. III, Testimony at pp. 594-607.

[7] *Id.*, at pp. 607-636.

[8] *Id.*, at pp. 637-644.

[9] *Id.*, at p 609.

[10] *Id.*, at 595 and 610 .

[11] *Id.*, at pp. 596-597, 612-614.

(7) Petitioner suffered from concentration hyperactivity disorder and severe depression;[12] and

(8) mental health professionals suspected Petitioner's behavior problems as a teenager were

caused by physical and mental abuse when he was a small child.[13]

The affidavits and/or documents now presented contradict the most compelling

mitigating testimony heard by the jury. For instance, if Petitioner's father had testified he

would have explained all of the steps he took to obtain legal custody of Petitioner when he

was notified of his abandonment by Petitioner's grandmother.[14] Petitioner was three (3)

years old at that time. Additionally, Petitioner's stepmother, Vicki Money, would have

testified Petitioner's father did everything he could to provide a home for Petitioner,

including moving close to Petitioner's grandmother so Petitioner would be able to maintain

contact with his grandmother and with Jason DeRosa, his brother.[15] Further, the jury would

have learned Petitioner remained in his father's care until he was 11 or 12 years old when he

moved back in with his mother and caring stepfather.[16] Although Ms. Money admits the state

removed Petitioner and her son from the home on one occasion, she indicates the children

were returned when they realized the allegations were unfounded. Based upon the fact the

children were returned, both Petitioner's father and stepmother would presumably have

denied that any sexual and/or physical abuse occurred while Petitioner was in their home.

---

[12]*Id.*, at pp. 622-623.

[13]*Id.*, at p. 623.

[14]Attachments to the Petition for Writ of Habeas Corpus, Attachment G.

[15]*Id.*, Attachment J.

[16]*Id.*, Attachment G.

There can be no doubt this testimony would have diluted the evidence which was actually presented at trial indicating that every one of Petitioner's caretakers contributed to Petitioner's abuse and/or emotional instability.

Further, in light of the compelling mitigating evidence which was actually heard by the jury regarding Petitioner's unstable childhood, this Court does not believe testimony regarding Petitioner having numerous ear infections when he was a baby;[17] having a strange look about him as a baby;[18] being a very loveable, nice guy and good student in high school that excelled in track[19] or that his mother was mentally ill despite the fact she was enlisted in the Army[20] would have convinced the jury to impose a sentence less than death. This is particularly true where, as here, despite counsel's compelling portrait of Petitioner as a troubled, neglected and abused child, the undisputed facts are (1) Petitioner planned a robbery against two elderly people who knew and trusted him; (2) after gaining access to the elderly victims' home and brutally executing them (by repeatedly stabbing them and throwing a marble table across the room on top of the male victim as he begged Petitioner to call for help for his wife), Petitioner stole money from the deceased victims and (3) Petitioner used this stolen money to buy tacos for himself and his accomplices at Taco Bell immediately following these vicious and senseless executions. Based upon the entire record

---

[17]Attachments to Petition for Writ of Habeas Corpus, Attachment D.

[18]*Id.*

[19]*Id.*, at Attachment O.

[20]*Id.*, Attachments B, C, D, E, and G.

herein, this Court is convinced that there is no reasonable probability that the evidence which petitioner now argues should have been presented to the jury would have convinced the jury to spare Petitioner's life. Therefore, this Court finds Petitioner has failed to establish prejudice. Accordingly, he is not entitled to relief herein.

## 2. Change of venue

In his second ground for relief, Petitioner argues he was deprived of a fair trial when the trial court denied his change of venue motion. Respondent asserts the Petitioner has failed to establish that the Oklahoma court's determination was an unreasonable application of clearly established federal law nor was it based on an unreasonable determination of the facts. Petitioner's reply asserts that the trial court's factual findings are incorrect and should not be given deference by this Court.

In *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), the Supreme Court made it clear that due process "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." In considering the scope of this right, the Court stated:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.*, 366 U.S. at 722-723, 81 S.Ct. at 1642-1643.

In rejecting Petitioner's claim in this case, the Oklahoma Court of Criminal Appeals

relied on numerous Supreme Court cases including *Irvin*, holding:

> On appeal, this Court focuses not on the jurors who might have been impaneled, but on the jurors who actually were impaneled. Hence the question becomes whether the record suggests that the jurors before whom DeRosa was tried were able to lay aside any prior knowledge or opinions regarding the case, and render a verdict based upon the evidence presented in court. Because evaluation of juror impartiality is a factual inquiry, based largely upon numerous credibility determinations, this Court will not reverse a denial of a change of venue motion absent a showing of abuse of discretion by the trial court.
>
> Hence a defendant seeking relief on appeal must show that the trial court abused its discretion and that, as a result, the defendant was denied his right to a fair trial before an impartial jury. This Court has recognized that in order to evaluate such a claim, our review should focus on (1) the voir dire statements of individual jurors, (2) voir dire statistics, and (3) the atmosphere within the community, as reflected in the news media. DeRosa does not contend that his case is one of the rare cases where media influence was so pervasive and prejudicial that prejudice must be presumed. Hence this Court will evaluate his claim by considering the totality of the circumstances surrounding his trial.
>
> We take up these considerations in reverse order, beginning with a review of the evidence of pretrial media coverage that was before the trial court. DeRosa's original change of venue motion attached ten newspaper articles covering the Plummer killings and the early developments in the case. The motion also attached three articles describing DeRosa and another inmate's short-lived escape from the LeFlore County Jail.
>
> A number of these articles appeared immediately after the discovery of the Plummer bodies, on October 3, 2000. These articles noted that their rural Poteau home had been ransacked, in an apparent "robbery turned homicide," and that a pickup truck was missing. The arrest and charging of the three original defendants in the case sparked additional coverage. Many of the articles noted that the Plummers had a large extended family in the area and that they were well-known and well-regarded in the community. Some of the articles described the Plummers as "wealthy," and some noted that Curtis Plummer, a "prominent retired businessman," had recently sold his successful

beverage distributorship and owned substantial land within the county. Some of the articles also noted the involvement of the Plummers in their church.

Yet not all of the media coverage of the defendants was negative. On October 9, 2000, an article appeared in the Southwest Times entitled, "Community Still Shocked Over Slayings: Family, Friends Say Suspects are 'Typical Young Men,'" which included numerous positive statements about DeRosa. Furthermore, the record contains no evidence of media coverage after October of 2000; and DeRosa does not allege any inappropriate media actions during his trial, in October of 2001.

On June 19, 2001, DeRosa filed a motion to expand voir dire on the issue of pretrial publicity, attaching a detailed public opinion survey about awareness of the Plummer killings, exposure to media coverage of the case, and the nature and strength of public opinion regarding DeRosa's guilt and possible punishments. The survey revealed very high awareness of the case in the community, significant familiarity with DeRosa's alleged involvement, substantial belief of his guilt among those familiar with his involvement, and substantial community feeling that the death penalty was the appropriate penalty for the killing of the Plummers.

Before voir dire began in DeRosa's trial, the trial court agreed to defense counsel's request for individual voir dire of prospective jurors regarding exposure to media publicity about the case as well as juror feelings about three possible punishments. Before any other questioning was allowed, each juror called to the panel was questioned about these issues, one at a time, in front of the trial court bench, outside the hearing of the other prospective jurors, first by the trial court and then by counsel for both sides. Any for-cause challenges on these issues were then immediately resolved, before any general questioning, in open court, was allowed to continue.

A total of fifty-one prospective jurors were questioned, in order to seat the twelve jurors who actually sat on Derosa's jury. Of those questioned on voir dire, thirty-five (nearly 69%) either knew the victims personally or had heard or read about the case. Of these thirty-five jurors, nine were struck for cause based upon their relationships with the victims and/or familiarity with the facts of the case. And another was struck for cause due to his friendship with the defendant's mother. After voir dire was completed, the trial court denied DeRosa's change of venue motion.

Of the twelve actual jurors, only one had any personal connection to the victims. This juror, John Reed, stated that his parents were friends with the Plummers. Reed also indicated that he knew other members of the Plummer family and that he had read about the crime in both the Southwest Times and the Poteau Daily News. Yet he repeatedly stated that he could be fair and impartial and that he had not formed an opinion about DeRosa's guilt.

Defense counsel had ample opportunity to use a peremptory challenge to remove Reed-and never challenged him for cause-but may have chosen to leave him on the jury because Reed indicated that he had gone to high school with DeRosa.

On the other hand, six of DeRosa's twelve actual jurors (including Reed) noted that they had read or seen media coverage about the Plummer killings. Another three expressed that although they had not seen any media coverage, they had heard about the killings through "word of mouth" in the community. Only three of the jurors that decided DeRosa's case came into the trial with no prior awareness of the killings of Curtis and Gloria Plummer. Hence 75% of the jurors who actually decided DeRosa's guilt had some prior awareness of the case; and 50% of the jury had been exposed to media coverage of the case.

Nevertheless, DeRosa did not challenge any of the jurors who ultimately decided his case; nor does he now claim that any of these jurors should have been struck for cause. In addition, DeRosa acknowledges that all of the jurors who decided his case stated that they could be impartial and that they would not be affected by anything they had previously seen or heard.

Derosa has established that there was widespread familiarity with the Plummer killings in LeFlore County, and substantial awareness of his alleged role in these killings. DeRosa has likewise established that this awareness was due, in large part, to media coverage of the killings. Thus the possibility for prejudice on his jury was real and substantial. Nevertheless, the trial court acted reasonably in deferring its decision on his change of venue motion until after voir dire, particularly where the trial court granted DeRosa's request for individualized voir dire on the issue of bias due to media exposure. Allowing individual voir dire on this issue allowed counsel for both sides to fully investigate what jurors already knew, or had heard or read about the case, without fear of unnecessarily "educating" or influencing other jurors.

Despite the difficulty of selecting an impartial jury under the circumstances of DeRosa's case, this Court concludes that the trial court's decision to allow a thorough and thoughtful voir dire (including individual voir dire about media exposure and penalty bias), along with the trial court's willingness to remove all questionable jurors, adequately met the challenge before the court. Although the potential for prejudice was certainly real, the transcript of voir dire in DeRosa's case, particularly for the jurors who actually decided the case, simply does not support DeRosa's claim that his jury was not adequately impartial and indifferent. Familiarity with a case does not, by itself, disqualify a potential juror from service; and DeRosa fails to establish that the jurors before whom he was tried did not meet the standard of being, nonetheless, "fair and impartial."

This Court notes that DeRosa is not asserting that any of the proffered newspaper articles contain statements that are false or inflammatory (beyond the appalling facts of the crime itself). DeRosa does not cite even a single media statement as inaccurate, and the newspaper articles from October of 2000 are almost entirely consistent with the evidence put on by the State during DeRosa's trial, one year later. While the articles about DeRosa's escape from jail certainly could have been prejudicial, his short-lived escape was never referenced at trial, and not a single juror mentioned any awareness of the escape during voir dire. Furthermore, while various articles discussed the "confessions" of White, none of them alluded to any confession or inculpatory statement by DeRosa; and the contents of White's various police interviews were fully explored at trial.

Under these circumstances, this Court concludes that the trial court did not abuse its discretion, either by deferring decision on DeRosa's change of venue motion until the time of trial, or by denying DeRosa's motion after voir dire was completed. DeRosa's jurors stated that they were willing to lay aside any prior knowledge or opinions and render a verdict based upon the evidence presented in court, and DeRosa has not given this Court any reason to reject these assurances. He fails to show that he was tried by a jury that was biased against him, due to media influence or otherwise. Hence his claim is denied.

*DeRosa*, 89 P.3d at 1135-1140 (footnotes omitted).[21]

Since the state court's decision is entitled to a presumption of correctness, 28 U.S.C. § 2254(e)(1), this Court's review of the state court findings is highly deferential. A state trial judge's findings are also given deference because the state trial judge personally observed the general demeanor of the jurors in rendering his finding regarding impartiality of the jury. *Breechen v. Reynolds*, 41 F.3d 1343, 1350 (10th Cir. 1994). A habeas petitioner attempting to establish that a due process violation occurred as a result of a state trial judge's failure to grant a change of venue motion "must demonstrate either that the trial resulted in actual

---

[21]Footnotes 48, 49, 50, 51, 52, 53, 55, 56, 57 58, 59, 60, 61, 62, 63, 64, 65 and 66 of the Oklahoma court opinion contain factual information regarding the number of newspaper articles, the date the articles were published and the contents thereof, how the telephone opinion poll was conducted and the results of the same, and a summary of the answers given during voir dire by prospective jurors

prejudice or that it gave rise to a presumption of prejudice because it involved 'such a probability that prejudice will result that it is deemed inherently lacking in due process.'"

*Id.* (quoting *Estes v. Texas*, 381 U.S. 532, 542-43, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543 (1965). *See also*, *Hale v. Gibson*, 227 F.3d 1298, 1331-1334 (10th Cir. 2000) and *Stafford v. Saffle*, 34 F.3d 1557, 1565-1568 (10th Cir. 1994).

### a. Presumed Prejudice

The Tenth Circuit has held that the defendant bears the burden of establishing that prejudice should be presumed. *U.S. v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991), overruled on other grounds. For a defendant to meet this burden, he

> . . . must 'establish that an irrepressibly hostile attitude pervaded the community.' This is a difficult standard, even in cases in which there has been extensive media coverage, because "[p]retrial publicity in topical criminal cases is inevitable. The publicity impacts defendant's rights only when it dictates the community's opinion as to guilt or innocence. In rare cases, the community is so predisposed that prejudice can be presumed, and venue must be transferred as a matter of law."

*Stafford*, 34 F.3d at 1566 (quoting *Abello-Silva*, 948 F.2d at 1176-77). *See also*, *Gardner v. Galetka*, 568 F.3d 862, 888-890 (10th Cir. 2009), *cert. den.*, — U.S. —, 130 S.Ct. 1737, 176 L.Ed.2d 215 (2010).

Only in a handful of cases has the Supreme Court presumed prejudice. Where the Court has presumed prejudice, "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings," *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), thereby creating a carnival atmosphere "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system

that subscribes to any notion of fairness and rejects the verdict of a mob." *Id.*, 95 S.Ct. at 2036. *See Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (finding due process violation where bedlam reigned at the courthouse during the trial with newsmen taking over practically the entire courtroom and the judge losing his ability to control the chaos); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (finding due process violation where community was bombarded with televised trial proceedings); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (finding due process violation where defendant's confession which was not admitted at trial was broadcast three times to tens of thousand of people in the local parish).

A review of the trial transcript, as well as the Oklahoma Court of Criminal Appeals summary of the trial proceedings, convinces this Court that the facts of this case do not rise to the level of those in *Sheppard*, *Estes*, or *Rideau*. While Petitioner argues there was extensive publicity given this case, most of the newspaper articles concerning the murders occurred more than a year prior to Petitioner's trial and did not contain specific details regarding the murders. O.R. 52-76.[22] Of the thirteen articles attached to Petitioner's Motion for Change of Venue, only three had any details of the investigation surrounding the murders. O.R. 70-71 and 73-76. Further, there is nothing in the record to indicate that there was a media frenzy during either the Petitioner's preliminary hearing[23] or his jury trial. The

---

[22]Excluding O.R. 72, which is missing from the original state court records that were transmitted to this Court.

[23]Despite the statement in Petitioner's Motion for Change of Venue that following Petitioner's preliminary hearing on December 6, 2000 "[t]here was once again another round of intense media coverage," no newspaper articles or references to television reports are cited in support of this statement. *See*, O.R. at 53.

evidence does not establish that the pre-trial publicity created an atmosphere in which Petitioner could not possibly have received a fair trial. Accordingly, this Court finds Petitioner has failed to meet his burden of demonstrating that "an irrepressibly hostile attitude pervaded the community such that prejudice could be presumed." *Hale v. Gibson*, 227 F.3d 1298, 1333 (10th Cir. 2000).

### b. Actual Prejudice

Next, Petitioner suggests that the voir dire proceedings demonstrate actual prejudice because, as noted by the Oklahoma Court of Criminal Appeals, nine of the twelve jurors who sat on the jury had heard of the case through word of mouth, newspaper, and/or television. In order to establish actual prejudice, Petitioner must show that one or more jurors believed before trial that Petitioner was guilty and that they could not set aside these preconceived notions. *Id.*, at 1332. In support of this claim, Petitioner focuses on statements made by prospective juror Holmes to argue that it was impossible for the jurors to set aside their preconceived notions of guilt and give Petitioner a fair trial untainted by pretrial publicity. This juror was, however, excused by Petitioner using one of his peremptory challenges. Furthermore, all of the statements by prospective juror Holmes which are cited by Petitioner were made at the bench outside the presence of all of the other prospective jurors and, therefore, they could not have influenced any of the other prospective jurors.

As indicated previously, jurors are not required to be totally ignorant of the facts. *Irvin*, 366 U.S. at 722-23, 81 S.Ct. at 1642. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

*Abello-Silva*, 948 F.2d at 1178 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961)). In this case, there is simply no evidence to suggest that the jurors who actually served on Petitioner's jury were biased against him or predisposed to find him guilty or to recommend a punishment of death. Thus, this Court finds Petitioner has failed to rebut by clear and convincing evidence the findings of the Oklahoma Court of Criminal Appeals regarding juror impartiality or to establish that the Oklahoma court's decision was an unreasonable determination of the facts in light of the evidence below. Additionally, this Court finds the facts herein do not establish that the Oklahoma court unreasonably applied established Supreme Court precedent to the facts of this case. As a result, this claim is denied.

### 3. Jury Selection

In his third ground for relief, Petitioner asserts he was deprived of Sixth Amendment right to an impartial jury when the trial court improperly excused a prospective juror. Respondent argues the Oklahoma Court of Criminal Appeals determination that the juror was properly excused for cause is neither contrary to nor an unreasonable application of clearly established federal law.

In considering this issue on direct appeal, the Oklahoma court held:

> Prospective juror Stanfill was equivocal in her responses to questions about whether she could consider the death penalty as a sentencing option. Early in her questioning, she indicated that she would have a preconceived notion that one of the three sentencing options was "ordinarily or always" the appropriate sentence for first-degree murder. She stated that she could consider all three sentencing options, but later acknowledged that she would have a "hard time" with the death penalty. When the court then asked her if

she could vote for the death penalty if the State proved the aggravating circumstances alleged and also that the death penalty was "the only appropriate sentence" in the case, Stanfill responded, "I don't think I would be able to."

On a follow-up question by defense counsel, Stanfill reversed herself and indicated that she could consider the death penalty in the case at issue. She also indicated that she could conceive of a set of facts where she could vote to impose the death penalty. The trial court then intervened to ask Stanfill a final question:

> If you found beyond a reasonable doubt that the defendant was guilty of one or-one of these murders, and you found also the State proved beyond a reasonable doubt that one or more aggravating circumstances existed, and the State also proved beyond a reasonable doubt that the death penalty was the only appropriate sentence, could you vote for the death penalty?

Stanfill responded, "To be honest, no." The trial court then excused Stanfill, over defense objection.

Stanfill was certainly equivocal regarding her ability to consider the death penalty as a sentencing option. Nevertheless, her final answer made clear that she did not believe that she could honestly consider sentencing DeRosa to death, even if the State proved that death was the "only appropriate sentence in the case." The trial court was able to directly observe and evaluate Stanfill, and the court's decision to remove her from the jury, for her admitted inability to fairly consider all three penalty options, was reasonable and justified. The trial court did not violate *Witherspoon* by striking Stanfill.

*DeRosa*, 89 P.3d at 1141.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court indicated prospective jurors must be "willing to consider all of the penalties provided by state law." In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court clarified its decision in *Witherspoon* and reaffirmed the standard adopted by *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). Under that standard, the trial court must determine "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror

in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852. "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." *Sallahdin v. Gibson*, 275 F.3d 1211, 1224 (10th Cir. 2002) (quoting *United States v. Chanthadara*, 230 F.3d 1237, 1270 (10th Cir. 2000)). A trial judge's decision of a potential juror's bias is a factual finding which is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *Davis v. Executive Dir. of Dep't of Corrections*, 100 F.3d 750, 777 (10th Cir. 1996), *cert. den.*, *Davis v. Zavaras*, 520 U.S. 1215, 117 S.Ct. 1703, 137 L.Ed.2d 828 (1997). *See also*, *Moore v. Gibson*, 195 F.3d 1152, 1168 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208, 120 S.Ct. 2206, 147 L.Ed.2d 239 (2000) and *Coleman v. Brown*, 802 F.2d 1227, 1232 (10th Cir. 1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987). Review of a trial judge's determinations regarding a juror's willingness and/or ability to follow the law as instructed by the court is quite deferential since what is being inquired into is a state of mind which may turn largely on assessments of demeanor and credibility, matters peculiarly within the province of the trial judge. *United States v. Tipton*, 90 F.3d 861, 880 (4th Cir. 1996). Additionally, such credibility findings can not be easily discerned from an appellate record. *Wainwright*, 469 U.S. at 429, 105 S.Ct. at 854. Claims that a jury was not impartial, however, must focus not on the jurors excused by peremptory challenge, but on the jurors who ultimately sat on the jury. *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.Ct. 2273, 2277, 101 L.Ed.2d 80 (1988).

After reviewing the entire questioning of prospective juror Stanfill, this Court finds that the Oklahoma court's decision was not an unreasonable determination of the facts. Rather, the transcript shows the juror either attempted first to answer the questions as she perceived she should answer or, as is often seen in questioning of prospective jurors in a death penalty case, she became aware of the gravity of what would be asked of her and changed her mind during the intense questioning. Initially this juror answered negatively when asked if she had any feelings about the death penalty that would prevent or substantially impair her from considering Oklahoma's three possible punishments for persons found guilty of murder first degree. J.T.Tr., Vol. I at pp. 44-45. But, when the judge inquired about any preconceived notions the juror might have, the juror indicated that she believed that one of the three punishments was "ordinarily or always the appropriate sentence for murder first degree." *Id*., at p. 45. Following this response, the following colloquy occurred:

> THE COURT: Oklahoma law provides that life imprisonment or life without parole is usually the proper sentence for murder first degree unless that presumption is overcome by proof beyond a reasonable doubt that death is the only appropriate sentence.
>
> JUROR: No, it's not.
>
> THE COURT: Pardon?
>
> JUROR: Death is not the - -
>
> THE COURT: That was statement; not a question. If you find the defendant guilty, can you follow this law?
>
> JUROR: Yes.

THE COURT: Okay. If you find the defendant guilty of murder first degree, we'd immediately hold a sentencing hearing and at this hearing the State would have the burden of proving beyond a reasonable doubt that the death penalty should be imposed, and in order to do this, they have to do two things: They have to show first of all that certain aggravating circumstances existed, and then they have to prove to you beyond a reasonable doubt that the death sentence is the only appropriate punishment in the case.

JUROR: Okay.

THE COURT: Follow me? Now, even if the State proves that these aggravating circumstances existed, you are never required to impose a death sentence, but may choose one of the lesser sentences of life or life without parole; do you understand that?

JUROR: Uh-huh.

THE COURT: If a sentencing hearing is held, you may also receive mitigating evidence which is proof of facts and circumstances which in fairness and mercy, may be considered as extenuating or reducing a defendant's degree of moral culpability or blame. Under the law, every juror in a murder case must be able to consider all three of these sentencing options: Death, life, or life without parole, in light of all the facts and circumstances in the case, including mitigating evidence in determining the appropriate punishment. Can you do this?

JUROR: Yes.

THE COURT: Okay.

MR. ROWAN: May (sic) ask a question, judge?

THE COURT: Sure.

MR. ROWAN: Ma'am, you said that some response to the question that in a first degree murder case that life, life without parole or death were the options, that you do have kind of a preconceived notion as to which punishment is the appropriate punishment for first degree premeditated murder.

JUROR: I can make a decision -- it's hard to make a decision as far as being death just to a human being.

31

MR. ROWAN: Okay. So you'd have a hard time with the death penalty?

JUROR: Yeah, more than anything.

MR. ROWAN: I think all of us would have a hard time with the death penalty.

THE COURT: If the State proved these aggravating circumstances that they allege beyond a reasonable doubt to your satisfaction and they also prove to you that death is the only appropriate sentence, would you be able to do that; to vote for the death penalty?

JUROR: I don't think I would be able to.

THE COURT: Okay.

MR. ROWAN: Judge, may I ask a follow-up?

THE COURT: Sure.

MR. ROWAN: Now earlier when the judge was asking you questions, he asked you to consider all three punishments. In the event that you found the defendant guilty of first degree premeditated or malice aforethought or felony murder during a homicide where the Plummers were killed in their own home near Howe, Oklahoma. In that event, you could consider the death penalty if the State proves it beyond a reasonable doubt, and proved aggravating circumstances and you could consider the death penalty.

JUROR: I could consider it.

MR. ROWAN: Okay.

MR. WALLACE: Okay. Ask on a follow-up, judge?

THE COURT: Sure.

MR. WALLACE: Ma'am, you said a moment ago that you would have a hard time imposing a death sentence that involved death.

JUROR: Sure.

MR. WALLACE: So when you say that you could consider the death penalty, can you conceive a set of the facts where you would vote to impose a death penalty?

JUROR: Yes, I could.

MR. WALLACE: Can you tell us what those facts - -

MR. ROWAN: Judge, I think that's invading the province of the jury to have her explain probably have the juror showing aggravating circumstances, but I don't think this juror should be required to say exactly when she'd impose a death sentence and what she'd require to do that. That's pretrying the case, judge.

MR. WALLACE: Judge, I'm just concerned that she has expressed concern about an ability to vote for a sentence that would involve the death of a human, and when defense counsel artfully crafted the facts for her, she changed her mind.

THE COURT: Well, I don't think this is far different from what you did, Mr. Rowan, earlier on another juror, but let me ask -- let me go go (sic) back and ask it this way, and maybe I (sic) just going to leave it as reasking the same question I asked previously. If you found beyond a reasonable doubt that the defendant was guilty of one or -- one of these murders, and you found also the State proved beyond a reasonable doubt that one or more aggravating circumstances existed, and the State also proved beyond a reasonable doubt that the death penalty was the only appropriate sentence, could you vote for the death penalty?

JUROR: To be honest, no.

J.T. Tr. at pp. 44-51. Following this unequivocal response, the trial judge properly excused the juror as it was clear that the juror could not honestly consider all three punishment alternatives.

After reviewing the entire voir dire, this Court finds prospective juror Stanfill's views on capital punishment would have "prevented or substantially impaired" her ability to carry

out her duties as a juror in accordance with the instructions of the court and her oath as a juror.  *See*, *Wainright*, 469 U.S. at 424, 105 S.Ct. at 852.   Therefore, this Court finds Petitioner has failed to establish that the decision of the Oklahoma Court of Criminal Appeals involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  Accordingly, this claim is denied.

### 4.  Prosecutorial Misconduct

Petitioner asserts in his fourth ground for relief that the prosecution engaged in misconduct during both stages of his trial thereby depriving him of his constitutional right to a fair trial and a reliable sentencing hearing.   Petitioner challenges the following prosecutorial actions as improper: (1) using "terms of endearment" when referring to the victims thereby aligning himself with the victim's family; (2) indirectly commenting on petitioner's right to remain silent; (3) arguing Scotty White had "no deal" was misleading and improper; (4) improperly vouching for state witnesses during closing argument; (5) accusing defense counsel of lying; and (6) attempting to limit consideration of mitigating evidence.  In considering these issues during direct appeal, the Oklahoma Court of Criminal Appeals   recognized several instances of prosecutorial misconduct occurred during Petitioner's trial, "including suggesting that defense counsel was 'lying' and inappropriately attempting to align the State with the victims-and found a particular statement by witness Janet Tolbert was improper."  *DeRosa*, 89 P.3d at 1149.  After considering each of the

alleged instances of prosecutorial misconduct singularly, the state court considered each of the actions deemed improper cumulatively and in the context of whether the improper conduct as a whole rendered the trial fundamentally unfair. In denying relief, the Oklahoma court held:

> . . . DeRosa has failed to show either that his trial was so infected by misconduct and unfair testimony as to violate due process, or that his death sentences were obtained through a violation of the Eighth Amendment. DeRosa was convicted and sentenced to death based upon the facts of his crime and the aggravating circumstances in the case, rather than any improper remarks by the district attorney or State witnesses.

*Id*. Again, Respondent argues Petitioner has failed to establish that the Oklahoma court's decision is either contrary to or involved an unreasonable application of clearly established Supreme Court law.

In federal habeas proceedings, claims of prosecutorial misconduct are reviewed only to determine whether a violation of due process occurred. *Malicoat v. Mullin*, 426 F.3d 1241, 1255 (10th Cir. 2005). As a general rule, a prosecutor's improper remarks will require a reversal of a state conviction if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). The fundamental fairness inquiry can only be made after an examination of comments within the context of the entire proceedings. *Id*. *See also*, *Duvall v. Reynolds*, 139 F.3d 768, 794 (10th Cir. 1998), *cert. denied*, 525 U.S. 933, 119 S.Ct. 345, 142 L.Ed.2d 284 (1998) (citing *United States v. Young*, 470 U.S. 1, 11-12, 105 S.Ct. 1038, 1044-45, 84 L.Ed.2d 1 91985)). Further, "the appropriate standard of review for

such a claim on writ of habeas corpus is 'the narrow one of due process and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 107 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly*, 416 U.S. at 642, 94 S.Ct. at 1871). In considering the impact of a prosecutor's remarks on the overall fairness of a trial, courts have considered any cautionary steps, such as instructions to the jury, offered by the court to counteract the prosecutor's improper remarks;[24] whether the objectionable content was invited by or was responsive to defense counsel comments;[25] how strong the evidence of guilt;[26] and counsel's failure to object at trial to the comments.[27] With these standards in mind, this Court will consider the individual instances of alleged misconduct.

*a.  Use of "terms of endearment"*

Petitioner first complains that the prosecutor, by using the names "Papa" and "Mama Glo" when referring to the victims, aligned himself and the entire prosecutor's office with the victims, thereby depriving Petitioner of a fair trial. In considering this allegation during direct appeal, although the Oklahoma court found the district attorney had improperly sought to align himself with the victims and the trial court had erred in overruling Petitioner's objection, the court held "[w]ithin the context of the entire trial, the prosecutor's actions were

---

[24]*Id.*

[25]*Id.*

[26]*Id.*

[27]*Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002); *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999); and *Johnson v. Gibson*, 169 F.3d 1239, 1249 (10th Cir. 1999).

not so prejudicial that they rendered DeRosa's trial fundamentally unfair or his death sentence unreliable." *DeRosa*, 89 P.3d at 1146.

Petitioner argues the Oklahoma court's conclusion that the prosecutor's actions were harmless is contrary to federal law and to the facts in the record below. To support his argument that the decision is contrary to federal law, Petitioner relies on *Viereck v. United States*, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed.734 (1943), for the proposition that "[a] prosecutor should not place his integrity and credibility in issue during a trial." While this Court does not dispute that general proposition, the case does nothing to change the standard of review to be utilized in ascertaining whether the prosecutor's actions deprived the defendant of a fair trial.

Although this Court does not disagree with the Oklahoma court's conclusion that the actions of the prosecutor in using the terms "Papa" and "Mama Glo" did not render Petitioner's trial fundamentally unfair, the Court does not agree with the state court's opinion on the impropriety of the prosecutor's actions. Simply using terms which a witness later uses does not necessarily imply to a jury that the prosecutor had a familial and personal relationship with the victims. Here, it is true that the prosecutor began using these terms to refer to the victims during his opening statement. J.T.Tr., Vol. I, Testimony, at pp. 21-33. Opening statements are intended to be a roadmap for the jury of the testimony which will be elicited and Roger Murray, the very first witness for the state, when asked what first brought him to the victim's ranch, stated he "had an interview with Papa." *Id*., at p. 39. Thereafter, Mr. Murray was asked "Did you come to know him as Papa after you went to work there?"

and he responded, in part: "Yeah. A short time after. That's what the the (sic) family all called him . . . ." *Id.*, at p. 40. *See also*, pp. 41, 51, 54-55, and Vol. III, Testimony, at p. 591 (witnesses' refers to victims as "Papa" and "Mama Glo"). Thus, it is just as likely that the prosecutor, who had presumably interviewed numerous witnesses, had heard these nicknames from more than one individual as he prepared for trial and he could, therefore, have reasonably anticipated that the witnesses would refer to the victims using their nicknames. This Court has not found a single Supreme Court case which holds that prosecutorial misconduct occurs simply where a prosecutor refers to a victim by a nickname. To find that the jury would somehow have felt like the prosecutor was aligning himself with the victims simply by using their nicknames when referring to them, seems like a stretch to this Court. This is particularly true where, as in this case, defense counsel didn't object to the use of these terms until after the opening statements were complete and the State's first witness had already indicated that "Papa" was the name everyone called the male victim. In any event, this Court finds Petitioner has failed to establish that the decision of the Oklahoma Court of Criminal Appeals was contrary to, or an unreasonable application of Supreme Court precedent.

*b. Commenting on Petitioner's Right to Remain Silent*

Next, Petitioner claims that during closing arguments the prosecution repeatedly bolstered his own witnesses while commenting on Petitioner's right to remain silent. In considering this argument on direct appeal, the state court noted that the challenged comments were made during the first stage closing arguments and Petitioner did not object

to the comments. In denying relief, the state court acknowledged that "[d]irectly contrasting one individual's decision to confess and plead guilty with that of a defendant who chooses to remain silent and go to trial-particularly if the first decision is described as "the right thing to do"-could constitute an undue burdening of a defendant's Fifth and Sixth Amendment rights." *DeRosa*, 89 P.3d at 1147. However, the court was quick to say this was not what had happened in this case. *Id.* After reviewing the comments in the context of the entire trial, the court followed the directive of *DeChristoforo*, 416 U.S. at 647, 94 S.Ct. at 1873, and refused to presume that the prosecutor intended his remarks to serve as an indirect criticism of Petitioner's failure to confess and plead guilty, especially where no one on Petitioner's defense team objected at the time of the remarks. *DeRosa*, 89 P.3d at 1147-1148. Thereafter, the state court found no due process violation occurred as a result of the prosecutor's argument. After reviewing the challenged comments in context, this Court finds Petitioner has failed to establish that the state court's decision was contrary to, or an unreasonable application of clearly established federal law.

*c. Prosecutorial Duty to Disclose Plea Deal*

Petitioner further argues the prosecutor violated a "duty of disclosure" by telling the jury in closing argument that there was no deal with Scotty White, thereby depriving Petitioner of a fair trial and due process of law. Respondent counters stating, even though Petitioner argued on direct appeal that the prosecutor improperly stated in closing argument that White "doesn't have a deal," Petitioner never asserted a claim for failure to properly

disclose any potential deal with White. Thus, Respondent asserts this claim should be procedurally barred.

In considering Petitioner's challenge to the prosecutorial statements regarding Scotty White on direct appeal, the Oklahoma Court of Criminal Appeals found:

> During cross-examination, defense counsel asked White whether he had "a deal," to which White responded, "What do you mean?". White then acknowledged that the original first-degree murder charges against him had been reduced to accessory after the fact, but testified that he had not yet plead guilty and that his attorney was "trying to work a deal" for him. It was clear to everyone at trial that White's assistance and limited involvement in the crime had led to the reduction of his charges and that White was hopeful that his cooperation would be taken into account at his eventual sentencing.
>
> * * * * *
>
> This court finds nothing improper in the prosecutor's statement that White "doesn't have a deal." The fact that White did not have a plea deal at the time of trial, though he admittedly hoped to make one, was apparently true, and it was appropriate for the prosecutor to note this fact. The suggestion that White's charges were reduced due, at least in part, to his limited involvement was likewise accurate and not misleading. Furthermore, the fact that White had cooperated and was testifying in the hope that it would help reduce his ultimate criminal liability was clear to everyone and was not "obscured" by the prosecutor's remarks. There was no prosecutorial misconduct here.

*DeRosa*, 89 P.3d at 1148.

To the extent the state court found White "did not have a plea deal at the time of trial" and Petitioner has failed to rebut this finding of fact, pursuant to 28 U.S.C. § 2254(e)(1), this Court presumes the correctness of this factual finding. To the extent the prosecutor's statement regarding the lack of a plea deal with Scotty White was true, Petitioner has failed to establish that any due process violation occurred in relation to this claim.

*d. Improperly Vouching for State's Witnesses*

Petitioner also complains that the prosecution vouched for the State's witnesses during his closing argument thereby depriving Petitioner of a fair trial. Petitioner challenges two specific comments of the prosecutor: 1) stating he was offended by defense implying Shawn Ward was a liar[28] and 2) stating "I promise you one thing: We've got more than enough to do up here than to sit around and trump up cases against people in the community."[29] Defense counsel's objection to the first comment was overruled but the objection to the second comment was sustained and the jury was admonished to disregard it.[30] This argument was addressed in Petitioner's direct appeal along with an additional comment of the prosecutor and, in denying relief, the state court found the state's remarks

> were in response to defense counsel's suggestion that Wilson had a "secret deal" with the State, which Ward was dishonestly denying, and the broader defense theme that the case against DeRosa was based not on actual guilt, but on the State's desire to "get him" through the bartered testimony of its witnesses.

*DeRosa*, 89 P.3d at p. 1148-1149. The state court went on to conclude that any inappropriate suggestion within the prosecutor's comment was minimal and did not affect the verdicts in the case. *Id.*

While prosecutors should not, as a general rule, vouch for the credibility of state witnesses or place their own integrity and credibility in issue,[31] the statements in this case

---

[28]J.T.Tr., Vol. III Testimony, at p. 551.

[29]*Id.*, at p. 552.

[30]*Id.*, at p. 553.

[31]*Moore v. Gibson*, 195 F.3d 1152, 1173 (10th Cir. 1999).

were clearly made in response to comments and/or suggestions of defense counsel. The Supreme Court has indicated that the idea of "invited response" should not be used to excuse improper comments, but to determine their effect on the trial as a whole. *Darden*, 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed2d 144 (1986)..

In reviewing the testimony during the trial, it is clear from defense counsel's cross-examination of the prosecution witnesses that he was attacking the credibility and/or motives behind each of the witnesses' testimony.[32] Furthermore, defense counsel's closing argument was based upon the "cracks" in the prosecutors case. J.T.Tr., Vol. III, Testimony, at p. 539. As defense counsel explained, the jury should not "trust" the prosecution's witnesses because (1) Eric Castleberry was an admitted murderer; (2) Scotty White was a liar; (3) Danny Wilson was an experienced criminal who showed the jury "his versatility, his ability to lie on the spot" in order to get a better deal from the state; and (4) Shawn Ward was lying about not having made a deal with Danny Wilson. *Id*., at p. 540-546. Thereafter, defense counsel told the jury they had the right to not trust any of the prosecution's witnesses arguing:

> . . . you have the absolute right. That's the one thing - - you're the one group of people more powerful than the district attorney in this state. You have the power to just say no to a false conviction. You have the power to just say no. [The prosecutor] has the power to accuse; he has the power to say who faces the death penalty and who gets to face life without parole. He has the power to dismiss charges. None of you have that power, but you do have this power: You have the right to just say no to a case that's built on a foundation as weak as this one is.
> . . . . . . Don't buy these peoples' stories untested, undigested. Don't swallow it hook, line, and sinker. Look for the beef. Look for the evidence.

---

[32]*See*, J.T.Tr., Vol. I, Testimony, at pp. 248-265, 270-271; Vol. II, Testimony, at pp. 283-303, 307-312, 341-347, 403-411.

Look for something solid. You'd (sic) don't have to believe these people. One accomplice, two accomplice, three accomplices. They can't corroborate each other. You've got to look for some evidence.

Now, Justin Wingo, okay. Justin Wingo, now there's a piece of work. Maybe I'm showing my cultural bias perhaps. I share Mr. Wallace's disdain probably in that same regard that - - he didn't look very trustworthy to me. . . . . . I don't know if you can take Justin Wingo as the fourth brick here and trust him completely either.

. . . . .when you've got a case built upon these four individuals that the D.A. has served up to you, then a jury like you deserves a little more than that. You deserve an anchor, something to base your faith in, because he's asking a lot of you. He's asking you to convict this man right here on testimony from four unreliable people.

*Id.*, at pp. 546-549. Defense counsel concluded by saying, "Don't convict [DeRosa] on the speculation and testimony of four disreputable people, . . . ." *Id.*, at p. 551. It was in response to these comments, the prosecutor said:

I don't know if you've noticed it, but I've noticed it: Everybody in this case is a liar. Have you noticed that? Wingo's a liar because we don't like his look; Wilson's a liar because of the things he's done in the past; Castleberry is a liar because he's trying to save his life; Scotty White's a liar 'cause he's just (sic) dumb high school kid. The one that really offends me is that Shawn Ward is a liar.

*Id*. At this point, defense counsel objected saying he had never called Shawn Ward a liar.

After a hearing outside the presence of the jury, the trial court overruled the objection and the prosecutor continued his closing statements arguing:

Shawn Ward is a conspirator with Jeff Mixon, an Assistant District Attorney. That's the defense here when you really get down to the core of it. He's got to get rid of Danny Wilson's testimony somehow because Danny Wilson's testimony cooks his client's goose, and the way he's chosen to get rid of it is to say that one of my assistant district attorneys conspired with one of my investigators to get his client.

Ladies and gentlemen, I promise you one thing: We've got more than enough to do up here than to sit around and trump up cases against people in the community.

*Id*., at p. 552. At this point, defense counsel objected again and the trial court sustained the objection and admonished the jury to disregard the last comment. *Id*., at pp. 552-553. After reviewing the statements in the context of the trial as a whole, this Court finds Petitioner has failed to establish that the decision of the state court was contrary to, or an unreasonable application of Supreme Court precedent. Petitioner was not deprived of a fair trial as a result of these two isolated comments of the prosecutor which were clearly made in response to defense counsel's cross-examination and/or closing statements.

*e. Accusing Defense Counsel of Lying*

Next, Petitioner asserts the prosecutor implied defense counsel was lying in an attempt to bolster his case. Specifically, after defense counsel cross-examined Daniel Wilson regarding favorable treatment for his testimony and what type of deal he had with the State and when the deal was actually made, the prosecutor called Shawn Ward, the District Attorney's office investigator, to counter defense counsel's suggestion that Shawn Ward had somehow supplied Wilson with specific dates to bolster his testimony. The prosecutor asked Mr. Ward, "How often do you commit conspiracies to get people thrown in the penitentiary?" J.T.Tr., Vol. III, at p. 314. To which defense counsel objected. All further discussion was held outside the presence of the jury. *Id.*, p. 314-315. The trial court ultimately ruled that the word "conspiracy" was argumentative, but that counsel could go into

the details of what happened between Wilson and Ward. As the prosecutor continued to question Ward about his dealings with Wilson, the following colloquy occurred:

Q: So the questions we heard [defense counsel] ask a while ago are not true?

A: No, sir; they are not.

Q: So it's a good questions (sic) who's lying in that --

To which, defense counsel objected. *Id.*, at p. 319. Although the trial court sustained defense counsel's objection and admonished the jury to disregard the remark, Petitioner argues that was not enough to cure the prejudicial effect of the attack on counsel's credibility and, therefore, Petitioner was deprived of a fair trial.

In considering this issue on direct appeal, the Oklahoma Court of Criminal Appeals reviewed the challenged remark in the context within which it arose including that the trial court immediately sustained the objection and admonished the jury to disregard the comment. While the state court correctly found that "the district attorney's behavior was clearly improper," the court went on to find that "the district attorney's remarks did not influence or taint the verdict in this case" because "Wilson's testimony was not critical, or even particularly significant, to the State's case against [Petitioner]." *DeRosa*, 89 F.3d at 1144. Thus, the appellate court found Petitioner "has not shown that his right to due process, or any other constitutional right, was prejudiced by the district attorney's remarks." *Id.*

To the extent that the evidence in this case was overwhelming, the question by the prosecutor was invited by defense counsel's questioning of Wilson, and the court immediately admonished the jury to disregard the prosecutor's remark, this Court finds the

prosecutor's unfinished question did not so infect Petitioner's trial with unfairness to make

his resulting conviction a denial of due process. Again, Petitioner has failed to establish that

the decision of the state court was contrary to, or an unreasonable application of Supreme

Court precedent.

*f. Attempting to Limit Consideration of Mitigating Evidence*

Finally, Petitioner alleges the prosecutor attempted to limit consideration of mitigating

evidence beginning with his questions in voir dire. Then, Petitioner claims the prosecutor's

closing argument, which pointed out that these crimes were everyone's fault but Petitioner's,

further denigrated Petitioner's mitigating evidence thereby depriving Petitioner of a fair trial.

No objections were made either when the challenged voir dire questions were asked nor at

the time the closing argument comments were made. Respondent urges this Court to deny

this claim as procedurally barred due to Petitioner's failure to raise the issue on direct appeal.

Petitioner argues the state court's bar of this claim was inadequate because his trial and

appellate counsel were the same.

Despite the fact that Petitioner did, in fact, raise this claim before the Oklahoma court

but the court improperly refused to consider the claim, *English v. Cody*, 146 F.3d 1257, 1264

(10th Cir. 1998), this Court finds absolutely no merit to Petitioner's claim. The purpose of

voir dire is to assist counsel in exercising peremptory challenges and with a view towards

ascertaining the prospective jurors' possible prejudices. *See*, *Mu'Min v. Virginia*, 500 U.S.

415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991). This court's inquiry is limited to

ascertaining "whether the trial court's restriction on voir dire rendered the trial fundamentally

unfair." *Sallahdin v. Gibson*, 275 F.3d 1211, 1222 (10th Cir. 2002) (quoting *Mayes v. Gibson*, 210 F.3d 1284, 1292 (10th Cir. 2000). The voir dire questions which Petitioner challenges, when read in context, are entirely appropriate.[33] All the prosecutor attempted to ascertain was whether or not the prospective jurors felt a criminal defendant should be held accountable for his actions. *See*, J.T.Tr., Vols. II and III, Voir Dire, at pp. 251, 281-282, 343, 372, 547-549. Further, defense counsel was given an opportunity to elicit information from the prospective jurors regarding whether or not they felt like events in childhood could have later repercussions in a person's life; whether they thought a person who grew up with both of their parents would have a better advantage in life and whether genetics and/or the environment plays a role in a person's development. *Id.*, at pp. 257, 259, 285, 306-307, 318, 379-381, 394-395. Finally, this Court has considered the small amount of time (less than 8 pages) spent on these questions by the prosecutor with the total length of the voir dire proceedings (approximately 557 pages) in finding that the questions asked by the prosecutor would not have impacted the fundamental fairness of this trial.

Petitioner also asserts a brief snippet of the prosecutor's closing argument during the second stage of trial denigrated the theme of his mitigating evidence thereby rendering his trial unfair. The purpose of closing arguments is to assist the jury in analyzing, evaluating and applying the evidence and a prosecutor may discuss any properly admitted evidence and any reasonable inferences or conclusions which can be drawn from that evidence. *United*

---

[33]Petitioner only challenges comments on five separate pages (251, 281-282, 372, and 549) of the 559 pages of the transcript containing the voir dire proceedings. This Court looked at all similar comments by the prosecutor in considering this issue.

*States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).   In this case, following defense counsel's summation of the evidence presented in the second stage of trial, including comments by defense counsel that (1) the jury should make their "decision based upon who James DeRosa is and how he got the way he is. . . .";[34] (2) the death penalty should be reserved for people who a) "are one hundred percent responsible for their actions"[35] and b) were "raised correctly,"[36] the prosecutor made the following comments which Petitioner now challenges:

> [Defense counsel] wants to ask you to consider the mitigating evidence and you must; the judge has instructed you of that.  And I find it interesting that a chain of events set in motion leading to these two horrible deaths by this defendant is now his father's fault, his mother's fault.  It's the daycare center's fault.  It's his grandmother's fault.  It's the fault of military doctors who didn't diagnose him appropriately and then when they did, didn't start the treatment appropriately.  It's the military's fault because they cut off the program that would have funded the treatment.  It seems it's everybody's fault.  This case is about personal responsibility.

J.T.Tr. Vol. III, Testimony, at p. 743-744.[37]   When taken in context, this Court finds the challenged comments were not improper.

As the Supreme Court has made clear, where a Petitioner makes a claim of prosecutorial misconduct, this Court's concern is the "fairness of the trial, not the culpability

---

[34] J.T.Tr. Vol. III, Testimony, at p. 727.  Additionally, the trial court specifically instructed the jury that they were required to "give individualized consideration to the degree of participation and focus on the Defendant's individual culpability in the homicidal act", O.R. 525, and the Court advised the jury of the mitigating evidence which had been presented in the case. *See*, O.R. 533-534.

[35] *Id.*, at p. 730.

[36] *Id.*.

[37] It should be noted that Petitioner did not include the first sentence quoted above in his challenge.  However, in context, this sentence is important to show that the prosecutor reminded the jury that they were required to consider the mitigating evidence.

of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). As previously stated, on habeas review, this Court's role is to determine whether, in view of the totality of the circumstances, the prosecutorial conduct throughout the trial was "so egregious so as to render the entire trial fundamentally unfair." *See*, *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). After considering all of the conduct complained of in the context of the trial as a whole and in light of the strength of the evidence against Petitioner, this Court is convinced that none of the prosecutor's actions, either singularly or cumulatively, rendered Petitioner's trial fundamentally unfair. Accordingly, this claim is denied.

### 5. Improper Comments of a Witness

In his fifth ground for relief, Petitioner claims the comments of Janet Tolbert, the victim's daughter, were so prejudicial that he was deprived of his constitutional right to a fair trial. Respondent counters that Petitioner has failed to establish that the Oklahoma court's determination of the facts relative to this claim were unreasonable in light of the trial court record. Further, Respondent argues Petitioner has failed to present any clearly established federal law which the Oklahoma court should have followed and, therefore, Petitioner's claim lacks merit.

In considering this issue during Petitioner's direct appeal, the Oklahoma Court of Criminal Appeals held:

> Janet Tolbert, the daughter of Curtis and Gloria Plummer, testified during both stages of DeRosa's trial. During the guilt stage, the State was attempting to

establish Tolbert's familiarity with DeRosa, when the following exchange occurred:

Q. Do you see the James DeRosa who worked for you and your parents during that time period in the courtroom today?

A. Oh, yes.

Q. Could you point to him an describe how he appears to you today?

A. You really don't want me to say that, and I'd be thrown out of here. I'm sorry.

In a bench conference immediately following the remark, defense counsel argued that the State should have prevented Tolbert's remark and sought a mistrial. The court overruled the motion and directed the State to ask Tolbert to identify the defendant by simply pointing at him.

DeRosa argues that the trial court "should *at least* have sustained [Petitioner's] objection and admonished the jury to disregard Tolbert's uncalled for comment." DeRosa did not, however, actually object to Tolbert's testimony or ask for such an admonishment, which, based upon the rest of the trial, would certainly have been given if it had been requested. This Court finds that although Tolbert's comment was improper, the record does not suggest that the State could have anticipated her response; nor does it suggest that the comment was so prejudicial that it contributed to DeRosa's convictions or his sentences.

*DeRosa*, 89 P.3d at 1145.

After reviewing the comments in light of the totality of the evidence introduced at trial, this Court does not believe that these comments were prejudicial since the witness was not allowed to say what she was thinking and the comment could not have been anticipated. Accordingly, this Court finds Petitioner has failed to establish that the decision of the Oklahoma Court of Criminal Appeals resulted in a decision contrary to, or an unreasonable application of, clearly established Federal law as determined by the United States Supreme

Court. Therefore, pursuant to 28 U.S.C. § 2254(d), Petitioner is not entitled to relief on this issue.

## 6. Victim Impact Evidence

Petitioner alleges in his sixth ground for relief that he was denied a fair trial as a result of the victim impact evidence which was admitted in the second stage of his trial. Petitioner argues that the emotional testimony of two witnesses "were not simple statements of how this crime . . . effected them but instead were pleas for revenge and requests for the particular sentence of death." Pet. at 76. Petitioner raised this issue during his direct appeal and the Oklahoma Court of Criminal Appeals adjudicated the issue on the merits. In denying relief, the Oklahoma court made the following findings:

> DeRosa first asserts that this Court has erroneously interpreted the Supreme Court's decision in *Payne v. Tennessee*, to allow for victim recommendations regarding the defendant's sentence, as well as victim characterizations of the crime. This Court has recently noted that although the Supreme Court had earlier forbidden such evidence, the decision in *Payne* left open the question of the validity of such evidence. The legislature of this State has specifically provided for the admission of this kind of victim impact evidence. And this court has rejected claims like DeRosa's in the past. The Court will not re-examine the issue here.
>
> Regarding the specific testimony presented during his trial, Derosa argues that the testimony of Tolbert and Milligan exceeded the bounds of an appropriate sentencing recommendation and contained improper characterizations of his crime. This Court has reviewed all of the victim impact testimony and finds that the testimony did go too far, particularly in terms of Tolbert's emotional plea for the death penalty and Milligan's speculative and inflammatory claims about the victims' experience of their attack. Nevertheless, the testimony was not "so unduly prejudicial" that it rendered DeRosa's trial "fundamentally unfair" or his sentencing "unreliable." This Court rejects DeRosa's specific challenges to the testimony of Tolbert and Milligan, as well as his claim that the overall effect of their victim impact

testimony created an unconstitutional risk that his jury would be unable to make a reliable sentencing determination in his case.

*DeRosa*, 89 P.3d at 1151-1152 (footnotes omitted).

The issue of victim impact evidence has been squarely addressed by the Supreme Court on several occasions.  First, in *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Court in a 5-to-4 decision held that the Eighth Amendment prohibits a jury from considering a victim impact statement at the sentencing phase of a capital trial. The Court made clear that the admissibility of victim impact evidence was not to be determined on a case-by-case basis, but that such evidence was *per se* inadmissible in the sentencing phase of a capital case except to the extent that it "relate[d] directly to the circumstances of the crime."  Thereafter, in *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the Court extended *Booth* to include prosecutorial statements to the sentencing jury regarding the personal qualities of the victim.

Later, in *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), the Court overruled *Booth* and *Gathers* holding:

> if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.  A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.  There is no reason to treat such evidence differently than other relevant evidence is treated.

*See also*, *Jones v. United States*, 527 U.S. 373, 395, 119 S.Ct. 2090, 2105, 144 L.Ed.2d 370 (1999)(Eighth Amendment allows a capital sentencing jury to consider evidence of victim's

personal characteristics and the emotional impact of the murder on the victim's family.)  If, however, the evidence introduced is "so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608 (citing *Darden v. Wainwright*, 477 U.S. 168, 179-183, 106 S.Ct. 2464, 2470-2472, 91 L.Ed.2d 144 (1986)). As stated in *Darden*, the question a reviewing court must consider is whether the evidence introduced "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181, 106 S.Ct. at 2471 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).

Oklahoma statutes authorize the admission of victim impact evidence.  Specifically, "victim impact statements" are defined as follows:

> information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence.

OKLA. STAT. ANN. tit. 22, § 984 (1999).

During the second stage of Petitioner's trial, the State adopted the evidence from the first stage of trial and then called two of the victims' family members to read prepared victim impact statements.  First, Janice Tolbert, the victims' only daughter, read the following statement:

> . . . .  I would like to address the jury and I'd like to address James Derosa. The summer of 1999, James Derosa came to work for us on the C&G Ranch.

53

His mother had been working for the family but left two weeks for National Guard. As a favor to James' mother, my parents let him come to work for us.

That particular summer was extra hot and it was dry. I had a home out on the ranch because my husband had died in '97. I am an only child and I was scared to live by myself. For a time, my old house had to be mowed also, but was several, several miles away from the ranch. James was pretty good but a little slow at his work. He would be at the house nearly all day. Daddy would call down to my house and tell me take some water and pop and check on him because he was concerned about Derosa out all day in that kind of heat. I would take water and pop and go over to check on him each time he mowed there. Derosa asked me if I came all the way just for that, and I said yes, my daddy sent me to check on you. I wanted to ask Derosa if he remembered what he said to me when I went over there that very first time. Derosa said, "I never worked for anybody that has treated me this nice."

My mother and daddy's murder has taken everything from me. It took my identity, it took my security. It took my rest. It took my happiness. It took my peace. It took my ability to enjoy anything. Their murders gave me sleepless nights, nightmares, and it gave me post-traumatic stress disorder. It gave me depression, tears upon tears, pain upon pain. It has covered my whole world in sadness, pain, and anger. There is not one minute of the day that I don't see their bodies and their blood in the den of their own home. This is the first thought when I wake up and the last before I go to sleep. I think of how the pain and the terror my mother and daddy must have suffered at the time of their murders. The horror and betrayal they felt when they were (sic) they realized that someone they knew was now taking their lives.

Our family has always been close. We are a small family but as close families do, we celebrate major holidays at my parents' home. Now it is too painful to gather the way we used to because it hurts too much. My parents were good, hardworking people. I could tell you stories how my parents helped a lot of people in this county. My life will never be the same. My mother and daddy were a part of my everyday life, and my children's, and my grandchildren's lives. I ask you, the jury, for justice. Although this will not bring them back to us, it will give us some peace of mind. Our family has suffered enough because of this man. My family pleads with you to give the death penalty. Thank you.

J.T.Tr., Vol. III, Testimony, at pp. 587-589.

Immediately following Ms. Tolbert's testimony, Jo Milligan, the sister of Gloria

Plummer, read the following prepared statement:

One year ago my sister and brother-in-law, Gloria and Curtis Plummer, were murdered. Glo, or Gloria, my big sister, my only sister, my only sibling, and Curtis became my brother when I was only five years old. I looked up to both of them. I depended on them for advice and support. I stayed with them a lot when I was in junior college at Poteau. They let me drive their cars when I had none. My sister gave me clothes, she cut my hair when my daddy didn't want it cut, laughed with me and cried with me; all of those sisterly things.

Their murders took a daughter and son-in-law, a mother and father, a grandmother and grandfather, a great grandmother and a great grandfather, a brother, as well as my only sister, my big sister. I've watched my family try to deal with pain, anger, grief. I've watched my mother grieve for her firstborn and want to be with her -- want to go to be with her. We are a very close family. We celebrated holidays and birthdays, most of the time at their house. We did our best last Thanksgiving, last Christmas, and all of our birthdays, but it wasn't the same. It will never be the same.

The loss of my sister and brother-in-law, especially in the horrible, heinous way in which they died, has given me many sleepless nights, nightmares, acid reflux and upset stomach, post-traumatic stress disorder and all of its components such as memory loss, depression, tears -- oh, so many tears -- anger, and physical pain in my heart. I would so love to hear my sister's voice again, her laughter, but I can only hear that in my dreams, and so many times it is not the loving and laughing voice, but the screams of pain and fear. I reach for the phone to call her. I need to talk to her. I need to call and discuss what to do about our mother. Now I'm all alone in those decisions. The last time I saw her was when she came to my house before I left for a trip. We reviewed what she should do if something happened to me. She thought I was the one at risk. I did get to talk to her by phone from Portugal, but it was before my bike riding trip. She wanted to know about it, but I'll never get to tell her about it. I'll never get to tell her about any of my other adventures or exciting times. I'll never get to tell her about my friends or her friends, and I will never, ever forgets (sic) the shock and horror I suffered when I called home from Portugal to hear the words Mama Glo and Papa had been murder. (sic) Murdered. Murdered. Here I was so far away and had to get a flight home early from an island off Portugal. I had thirty-two hours alone to think about what I could not believe. Had I not been in shock the entire time, I could not have even made the trip. Knowing that she suffered pain and terror in her last moments is devastating. They were helpless, knowing they were going to die, and there was no way I could be there to help. I feel guilt that I wasn't there and maybe this wouldn't have happened had I not been gone.

Glo and Curt were wonderful people. I know that and I've been reminded by so many people. They helped so many people. They loved their family. They loved life. They were loved and spoken well of by so many people. They were friends to many. Every morning, I look out my kitchen window at their house and I can't call them. I can't talk to them. I can't have coffee with them. There is no advice. No laughter. No peace. But there is fear. Fear that someone I trust might betray me. There's fear that something could happen to someone else in my family. Something could happy (sic) to one of my friends. Something could happen to me. I moved back here to be with my family. Now my family has been reduced by two people. That's twenty percent of my family. I feel a void. I struggle with my relationship with God. I keep asking Him where was he? I can't understand this. I will always wonder why? Why? Why my life and the lives of my family and friends have been destroyed. They will never be the same. We will always be victims. Thank you.

*Id.*, at pp. 589-592.

Turning to Petitioner's arguments, this Court agrees with the Oklahoma Court of Criminal Appeals assessment that some of this victim impact evidence was in violation of the Eighth Amendment. Specifically, Tolbert's emotional plea that the family wanted the death penalty to be imposed and Milligan's speculative claims about the terror the victims must have suffered in their last moments exceeded the bounds of *Payne* and *Booth*, and therefore, violated Petitioner's Eighth Amendment rights. *See*, *Hain v. Gibson*, 287 F.3d 1224, 1234-1240 (10th Cir. 2002) (holding Eighth Amendment violation occurred where four of the five witnesses during second stage proceedings all stated, or at least strongly implied, they felt the defendant should receive the death penalty and four of the witnesses commented in one way or another on the defendant and the crime (e.g., stating it was hard "to imagine that anyone could have that much hate and meanness in them," criticizing defendant for being "fully aware that he was taking the life of two young and beautiful people," for

returning to the car "to make sure it was going to do the job and make sure that [the victims] would die," and for failing to do anything "to stop the horrible set of events which he had set into motion")).

The remaining question is whether the error was harmless or requires the reversal of Petitioner's death sentences. As indicated above, the Oklahoma Court of Criminal Appeals addressed this issue finding "the testimony was not 'so unduly prejudicial' that it rendered DeRosa's trial 'fundamentally unfair' or his sentencing 'unreliable." *DeRosa*, 89 P.3d at 1152. Under the AEDPA, this Court's task is to decide whether the Oklahoma court's decision was reasonable. *See*, 28 U.S.C. § 2254(d)(1).

After carefully reviewing the transcript of Petitioner's jury trial, this Court finds, in light of the overwhelming evidence of guilt in this case, the fact that the entire victim impact testimony took less than six (6) pages of the seven hundred and fifty (750) pages of evidence and the closing arguments of counsel[38] and the fact Petitioner presented approximately 100 pages of mitigating evidence following the victim impact testimony, that the Oklahoma Court of Criminal Appeals decision was not contrary to nor an unreasonable application of *Payne*. To the extent that any victim impact testimony was improperly admitted, it clearly constituted a trial error subject to harmless error analysis. *Hain*, 287 F.3d at 1239-1240. Further, based upon the extremely callous nature of the crime involved herein, this Court can say beyond any doubt that none of the victim impact testimony introduced below, either

---

[38]This does not include the more than 550 pages of transcript involving the voir dire proceedings.

singularly or as a whole, rendered Petitioner's sentencing hearing so fundamentally unfair as to deny him due process. Accordingly, Petitioner is not entitled to relief herein.

## 7. Jury Instructions

In his tenth ground for relief, Petitioner seems to argue he was denied a fair trial because trial counsel did not request and the trial court failed to give an instruction advising the jury that Petitioner had a constitutional right not to testify. Petitioner first raised this issue during post-conviction proceedings and the Oklahoma Court of Criminal Appeals found the claim could have been raised on direct appeal and therefore, it was procedurally barred.

Additionally, in his seventh ground for relief, Petitioner asserts failure to instruct the jury that aggravating factors had to outweigh mitigating factors beyond a reasonable doubt rendered his "death sentences unconstitutional and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments. Petitioner first raised this claim in his application for post-conviction relief and the Oklahoma Court of Criminal Appeals rejected it on the merits.

*a. No-adverse-inference instruction*

Regardless of whether this claim is deemed procedurally barred or not, it lacks merit. In *Carter v. Kentucky*, 450 U.S. 288, 300, 101 S.Ct. 1112, 1119, 67 L.Ed.2d 241 (1981), the Supreme Court held "the Fifth Amendment requires that [a] criminal trial judge must give a 'no-adverse-inference' jury instruction **when requested by a defendant** to do so." The record below is clear that this instruction was removed from the instructions proposed by the trial court "because the defendant did not desire to have them in there." *See*, J.T.Tr., Vol. III, Testimony, at p. 510. This Court finds, under the principles enunciated in *Strickland*, 466

58

U.S. at 694, 104 S.Ct. at 2068, Petitioner can not show there is a reasonable probability that, inclusion of this instruction, would have caused the jury to have a reasonable doubt respecting guilt, or in other words, there is **no** probability that the omission of this instruction lead to the guilty verdicts in this case. Thus, Petitioner has failed to establish prejudice. Furthermore, since there is no probability that the verdicts in this case would have differed if the instruction had been given, this Court finds Petitioner has failed to establish that omission of the instruction rendered his trial fundamentally unfair. Accordingly, this claim is denied.

*b. Weighing of aggravating and mitigating circumstances*

Petitioner argues the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which require a jury to find, beyond a reasonable doubt, any fact that increases the maximum penalty, required the jury in this case to determine whether aggravating factors outweighed mitigating factors beyond a reasonable doubt. In rejecting Petitioner's claim, the Oklahoma Court of Criminal Appeals relied upon its decision in *Torres v. State*, 58 P.3d 214 (Okla. Crim. App. 2002) which held "Oklahoma's provision that jurors make the factual finding of an aggravating circumstance beyond a reasonable doubt is all that *Ring* requires." *Id.*, at 216.

In *Ring*, the Supreme Court held that capital defendants were entitled to a jury determination, beyond a reasonable doubt, of any fact that could increase their maximum punishment from life to death. In Petitioner's case, the jury ultimately decided, beyond a reasonable doubt, that the murder was "especially heinous, atrocious or cruel" and that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution." *Ring* did not change relevant Supreme Court case law to also require an instruction to the jury that the aggravating circumstances must outweigh the mitigating evidence beyond a reasonable doubt. Furthermore, in *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), the Supreme Court indicated as long as the State is required to prove aggravating circumstances beyond a reasonable doubt before a defendant is considered death-eligible, the "State enjoys a range of discretion in imposing the death

penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." *Id.*, 548 U.S. at 174, 126 S.Ct. at 2525.  Accordingly, Petitioner has failed to establish that the Oklahoma Court's adjudication of this claim was contrary to or an unreasonable application of relevant Supreme Court precedent.  Petitioner is therefore, not entitled to habeas relief on this issue.

## 8.  Aggravating Circumstances

In his eighth ground for relief, Petitioner claims there was insufficient evidence to establish the murder to avoid arrest aggravating circumstance and that this aggravating circumstance is unconstitutional as applied.  Additionally, in his ninth ground for relief, Petitioner asserts the heinous, atrocious, or cruel aggravating circumstance was not properly defined.  Respondent argues the Oklahoma court's determination on both of these issues was not contrary to nor an unreasonable application of clearly established Supreme Court precedent.

a.  Murder to avoid arrest aggravator

### 1.  Sufficiency of evidence

Petitioner argues because Castleberry began the stabbings in this case, thereby assuming a leadership position in the crime, there is no evidence Petitioner did what he did with an intent to avoid lawful arrest.  In addressing this issue on direct appeal, however, the Oklahoma Court of Criminal Appeals made numerous factual findings which support the jury's finding.  Since Petitioner has not attempted to refute these factual findings, other than

to state "he did not commit the murder of Mrs. Plummer,"[39] they are presumed correct. 28

U.S.C. § 2254(e)(1). Specifically, the Oklahoma court found:

> To establish this aggravator the State must show that a murder was committed for the purpose of avoiding arrest or prosecution for a separate, predicate crime, apart from the murder itself. The defendant's intent in this regard can be proven by circumstantial evidence.
>
> When the sufficiency of the evidence for an aggravating circumstance is challenged on appeal, this Court reviews the evidence in the light most favorable to the State, to determine whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. The evidence presented during DeRosa's trial was more than sufficient to establish the "avoid arrest" aggravator for both murders.
>
> DeRosa began plotting the Plummer robbery approximately six months before it was actually accomplished. He attempted to recruit Chris Ford, and eventually did recruit Eric Castleberry and Scotty White, to help him rob his former employers, on the theory that the elderly couple would have a lot of cash in their home and would be an "easy target." The evidence presented at trial strongly suggests that the robbery, rather than the murders, was the primary goal of DeRosa's plan. Yet the evidence also shows that DeRosa was committed to the goal of not being caught or prosecuted for this robbery, and that he decided that killing the Plummers was the best way to accomplish this goal.
>
> DeRosa organized and planned the robbery so as to avoid detection. He and Castleberry brought along gloves (and a sock) and wore them as they ransacked the Plummer home, looking for cash and other valuables to steal. They planned to dispose of their intended getaway vehicle (an old pickup parked at the Plummer home) by abandoning it on Sugarloaf Mountain. And DeRosa told White to check back at the Plummer home shortly after he dropped them off, apparently intending to abort the plan if anyone else, other than the elderly couple, was present in the home.
>
> Yet DeRosa and Castleberry did not bother to wear any kind of mask or disguise their appearance in any way. DeRosa was fully aware that the Plummers would recognize him; in fact, he relied upon this recognition as the means by which they would be allowed into the home. Unfortunately, this sinister plan succeeded. DeRosa and Castleberry not only brought knives with them, they also placed clothing to change into within Castleberry's car- suggesting that they both fully expected that their clothing could become

---

[39]Pet. at p. 102.

bloody and soiled during the robbery. And once the robbery was in process, DeRosa and Castleberry worked together to ensure that it was not impeded and that they would not be caught.

Although Castleberry never actually admitted that he and DeRosa went to the Plummer home expecting and intending to kill the elderly couple, in order to avoid being arrested or prosecuted for robbing them, this inference is inescapable from the evidence presented at trial-including the evidence that DeRosa later stated that his plan had gone "perfectly," until Scotty White squealed to the police. The evidence presented at trial was more than sufficient to establish, beyond a reasonable doubt, that DeRosa planned and accomplished the murders of Curtis and Gloria Plummer in order to avoid arrest and prosecution for robbing them. The robbery, which was separately planned and carried out, was an entirely distinct crime.

*DeRosa*, 89 P. 3d at 1153-1154 (footnotes omitted).

In *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), *reh. denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), a federal habeas proceeding challenging the sufficiency of the evidence in a state trial, the United States Supreme Court held that a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Further, the Court indicated following conviction, a judicial review of the "evidence is to be considered in the light most favorable to the prosecution." *Id.* In *Lewis v. Jeffers*, 497 U.S. 764, 782, 110 S.Ct. 3092, 3103, 111 L.Ed.2d 606 (1990), the Court said the principles enunciated in *Jackson* apply with equal force to federal habeas review of a state court's finding of aggravating circumstances.

Although aggravating circumstances are not "elements of any offense, see *Walton, Id.,* 497 U.S., at 648-649, 110 S.Ct., at 3054-3055, the standard of federal review for determining whether a state court has violated the Fourteenth Amendment's guarantee against wholly arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth Amendment's bedrock

guarantee against the arbitrary or capricious imposition of the death penalty. Like findings of fact, state court findings of aggravating circumstances often require a sentencer to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson, supra*, 443 U.S., at 319, 99 S.Ct., at 2789.

*Lewis*, 497 U.S. at 782, 110 S.Ct. at 3103.

Further, the Tenth Circuit has stressed that review, under *Jackson*, is

'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' *Wright v. West*, 505 U.S. 277, 296-97, 112 S.Ct. 282, 2492-03, 120 L.Ed.2d 225 (1992), *citing Jackson*, 443 U.S. at 326, 99 S.Ct. at 2792. The Court may not weigh conflicting evidence nor consider the credibility of witnesses. Rather, the Court must 'accept the jury's resolution of the evidence as long as it is within the bounds of reason.' *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993).

*Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir. 1996). Thus, this Court's review is limited to determining whether the Oklahoma Court of Criminal Appeals' decision, that there was sufficient evidence, was contrary to or an unreasonable application of *Jackson*. 28 U.S.C. § 2254(d)(1).

After a review of all of the evidence at trial in the light most favorable to the State, this Court finds the Oklahoma court's decision was not contrary to nor an unreasonable application of *Jackson*. The evidence clearly established beyond a reasonable doubt that DeRosa went to the Plummers home to commit a robbery; that DeRosa took precautions to keep from being identified by anyone but the victims like going to the house after dark; that he and his accomplice wore gloves (and a sock) on their hands to avoid leaving fingerprints even though they made no attempt to cover their faces from the victims who personally knew

DeRosa; that they put a change of clothing in their car prior to the robbery; and ultimately they each participated in the murders of the two eyewitnesses to the robbery. Clearly, this evidence supports the jury's finding that each of these murders were committed to avoid arrest or prevent a lawful arrest or prosecution. Accordingly, this Court finds Petitioner's argument that this aggravator was not supported by the evidence is totally without merit.

### 2. Constitutionality of "avoid arrest" aggravator

Petitioner also states that this aggravating circumstance is unconstitutionally overbroad as applied in this case. Other than stating, however, that "the lack of adequate evidence proving the aggravating circumstance resulted in a sentence of death which lacks reliability," Petitioner does not explain in his habeas petition how he believes this aggravator is unconstitutionally overbroad nor does he cite any legal authority to support this assertion. The Oklahoma Court of Criminal Appeals held that this aggravator was not "overbroad as applied in this case." *DeRosa*, 89 P.3d at 1154.

In order to be constitutional, an aggravating circumstance must meet two requirements. *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). First, it cannot apply to every defendant convicted of murder but must apply only to a subclass of defendants convicted of murder. *Id.* (citing *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993)). Second, it must not be unconstitutionally vague. *Tuilaepa*, *supra* (citing *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-1765, 64 L.Ed.2d 398 (1980)).

Oklahoma's "avoid arrest" aggravating factor authorizes the imposition of the death penalty if the jury finds "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution."[40]  In *Davis v. Executive Dir. of Dep't of Corrections*, 100 F.3d 750, 769-70 (10th Cir. 1996), *cert. denied*, *Davis v. Zavaras*, 520 U.S. 1215, 117 S.Ct. 1703, 137 L.Ed.2d 828 (1997), the Tenth Circuit upheld a similar aggravating circumstance in Colorado's statutes finding the aggravator sufficiently narrowed the class of defendants to whom it applied.  *See also*, *Wainwright v. Lockhart*, 80 F.3d 1226, 1231 (8th Cir. 1996), *cert. denied*, 519 U.S. 968, 117 S.Ct. 395, 136 L.Ed.2d 310 (1996) (holding similar Arkansas aggravator was properly applied to a murder which was committed in the course of a robbery, in order to prevent the murder's identification by the victim).

Under Oklahoma law, the predicate crime for this aggravator must be separate and distinct from, rather than significantly contributing to, the murder.  *Barnett v. State*, 853 P.2d 226, 233-34 (Okla. Crim. App. 1993).  In *Boyd v. Ward*, 179 F.3d 904, 922-923 (10th Cir. 1999), the Tenth Circuit held instructing the jury in accordance with the statutory language of the aggravator meets constitutional standards.

In this case, the jury was given the following instruction:

The State has also alleged that "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution."  This aggravating circumstances (sic) is not established unless the State has proved beyond a reasonable doubt that:  First , there was another crime separate and distinct from the murder; and Second, the Defendant committed the murder with the intent to avoid being arrested or prosecuted for that other crime.

---

[40]*See*, OKLA. STAT. tit. 21, § 701.12(5).

Instr. No. 8, O.R. 531.

Based upon the record herein, this Court finds the Oklahoma court's adjudication of this issue was not contrary to federal law as determined by the Supreme Court since this aggravator clearly narrows the class of defendants to whom it applies. Further, this aggravator is not unconstitutionally vague but has a "common-sense core of meaning that criminal juries are fully capable of understanding." *See*, *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. at 2636 (quoting *Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. 2950, 2959, 49 L.Ed.2d 929 (1976) (White, J., concurring)). Accordingly, Petitioner's argument, that the aggravator is unconstitutional as applied, lacks merit.

b.  Heinous, atrocious or cruel aggravator

In his ninth ground for relief, Petitioner asserts that the heinous, atrocious or cruel aggravator was "not properly defined." Thus, it appears Petitioner's argument is that the jury instructions defining this aggravator were improper, thereby depriving him of a fair trial. Additionally, Petitioner says, despite the factual findings by the Oklahoma court, that there was insufficient evidence to support this aggravating circumstance. Respondent argues Petitioner has failed to show that the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts.

In considering this issue on direct appeal, the Oklahoma Court of Criminal Appeals found the jury instruction defining the

"'heinous, atrocious, or cruel' aggravating circumstance largely tracked the instruction proposed by defense counsel, and went substantially beyond the current uniform instruction for this aggravator, OUJI-CR(2d) 4-73. The instruction left out, however, the following two sentences proffered by defense counsel: (1) "The term 'serious physical abuse' refers to the infliction of gratuitous violence beyond the act of killing."; and (2) "The term 'conscious physical suffering' refers to suffering in addition to that brief period of conscious suffering present in virtually all murders." DeRosa challenges the trial court's refusal to include these two definitions in the jury instruction in this case.

This Court finds that the trial court did not abuse its discretion in declining to modify the uniform jury instruction for the "heinous, atrocious, or cruel" aggravating circumstance in the manner requested by DeRosa. Although the proposed language equating "serious physical abuse" with "gratuitous violence . . . beyond the act of killing" does appear within this Court's decision in *Hawkins v. State*, even *Hawkins* did not require that the jury be instructed on this definition. Furthermore, this Court has not treated *Hawkins* dicta as establishing a binding definition of "serious physical abuse," and we decline to do so here. DeRosa cites no authority from this Court supporting his proposed definition as part of the uniform jury instruction for this aggravating circumstance. Hence DeRosa's appeal on this basis is rejected. The trial court did not abuse its discretion in refusing to instruct DeRosa's jury in the manner proposed by defense counsel.

*DeRosa*, 89 P.3d at 1155. Thereafter, the Oklahoma court decided a replacement of the current version of Oklahoma's uniform jury instructions was appropriate. In adopting the new uniform instruction for use in cases subsequent to Petitioner's case, the Oklahoma court held:

This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate, and this Court does not hold thus. . . . . .

The Court notes that although the jury instruction given by the trial court in DeRosa's case is somewhat different than the new uniform instruction, the instruction given in his case was actually more demanding than the new instruction-since it (incorrectly) required that "conscious physical suffering" be found in every case in which the "heinous, atrocious, or cruel aggravator is

68

applied. Hence DeRosa could not have been prejudiced by the instruction given in his case.

*Id.*, at 1156-1157.

While Petitioner complains about the Oklahoma's courts adoption of a new instruction defining this aggravator, he makes no attempt to establish how the instruction which was given in his trial deprived him of a fair trial. Rather, Petitioner argues, relying on a footnote in *Hawkins v. State*, 891 P.2d 586, 597 n. 3 (Okla. Crim. App. 1994) and on *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (Okla. Crim. App. 1995) that there was insufficient evidence to support this aggravating circumstance, in particular to establish that Petitioner individually engaged in conduct that would support the jury's finding "beyond a reasonable doubt that Petitioner committed this crime." What Petitioner seems to be arguing is that he should not be subjected to the death penalty simply because he aided and abetted the robbery of Ms. Plummer but did not personally kill her. The Supreme Court has specifically rejected such an argument where the defendant's participation, combined with reckless indifference to human life, is substantial. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). *See also*, *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

Where, as in this case, the evidence clearly established that Petitioner was an active participant in both murders, this Court finds Petitioner has failed to establish that the findings of the Oklahoma court are based upon an unreasonable determination of the facts. Additionally, Petitioner has failed to establish that the decision of the state court was an unreasonable application of federal law.

## 9. Cumulative error

In his eleventh ground for relief, Petitioner claims the accumulation of errors in this case denied him due process of law and a reliable sentencing hearing. Therefore, he alleges the Eighth and Fourteenth Amendments of the United States Constitution necessitate reversal. Respondent again argues that Petitioner has failed to establish that the decision of the Oklahoma Court of Criminal Appeals is contrary to, or an unreasonable application of Supreme Court precedent. In considering this issue on direct appeal, the Oklahoma appellate court rejected Petitioner's claim because it determined that

> any errors and irregularities, even when considered in the aggregate, do not require relief, because they did not render his trial fundamentally unfair, taint the jury's verdicts, or render his sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively. As we have stated repeatedly, DeRosa was convicted and sentenced to death based upon properly admitted evidence, in both stages of his trial. His convictions and death sentences were not the result of trial court error, prosecutorial misconduct, or improper evidence or witness testimony, even when considered in combination.

*DeRosa*, 89 F.3d at 1157.

The United States Supreme Court has recognized "there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). Thus cumulative-error analysis aggregates all errors found to be harmless and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). Based upon the overwhelming and unrefuted evidence of Petitioner's guilt,

including evidence that (1) Petitioner planned the attack on the victims for some time before he obtained the assistance of others to carry out these brutal and vicious assaults upon two elderly victims who had previously befriended Petitioner by giving him a job on their farm; (2) the senseless and callous manner in which the executions were carried out; and (3) the fact Petitioner used the $73.00 stolen from the victims to buy tacos at Taco Bell for he and his accomplices immediately following this extremely barbaric assault, this Court finds that the errors in Petitioner's trial did not substantially influence the jury's verdicts nor affect the underlying fairness of this trial. Therefore, this Court finds the decision of the Oklahoma Court of Criminal Appeals was not contrary to, nor an unreasonable application of Supreme Court law. Accordingly, this argument lacks merit.

## 10. Lethal injection

Petitioner claims in his twelfth ground for relief that Oklahoma's lethal injection protocols violate his Fifth, Eighth and Fourteenth Amendment rights. Respondent asserts that this claim is unexhausted and, therefore, Petitioner is procedurally barred from raising it herein. Petitioner acknowledges that he has not fully exhausted this claim but asserts he is raising it "prophylactically because he recognizes the methods of execution employed by the State of Oklahoma can and do change over time and the issue of how execution by lethal injection will be conducted with respect to him is not yet ripe for review." Pet. at 120. Further, Petitioner admits since he is not asserting that the method of lethal injection in Oklahoma is unconstitutional *per se*, an action under 42 U.S.C. § 1983 is the appropriate vehicle by which to challenge Oklahoma's lethal injection protocols and procedures. In light

of the Supreme Court's decision in *Hill v. McDonough*, 547 U.S. 573, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), in which the Court held, without ruling on the constitutionality thereof, that a cruel and unusual challenge to a particular method of lethal injection was properly raised in a § 1983 action, Petitioner's concern that he will be foreclosed from later raising this issue is unwarranted.

Furthermore, as previously indicated, where a petitioner fails to present a claim to the state courts, review in federal court is precluded "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 724, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640 (1991). Petitioner does not even attempt to demonstrate cause for the default or actual prejudice. However, it is not necessary to decide that Petitioner's claim is procedurally barred or is not yet ripe for review because the claim has no merit. In *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), the United States Supreme Court upheld, against an Eighth Amendment cruel and unusual constitutional challenge, the use of a three-drug lethal injection protocol similar to Oklahoma's. *See also*, *Hamilton v. Jones*, 472 F.3d 814 (10th Cir. 2007), *cert. denied*, 549 U.S. 1158, 127 S.Ct. 1054, 166 L.Ed.2d 783 (2007) (holding Petitioner had failed to show "a substantial likelihood of prevailing on the merits" on a similar claim that Oklahoma's lethal injection protocol violates the Eighth Amendment's cruel and unusual punishment prohibition). Accordingly, this Court finds Petitioner's claim is frivolous.

## VI.  CONCLUSION

After a thorough review of the Petition for Writ of Habeas Corpus and Attachments thereto, the Respondent's Response, the Petitioner's Reply and the state court records filed herein, this Court finds Petitioner has failed to establish that he is currently in custody in violation of the Constitution, laws or treaties of the United States as required by 28 U.S.C. § 2254(a).  Therefore, for the reasons stated herein, Petitioner's Petition for Writ of Habeas Corpus (Dkt. No. 17) is hereby denied.  Additionally, for the reasons set forth herein, Petitioner's request for an Evidentiary Hearing is denied.

### ACCORDINGLY IT IS HEREBY ORDERED THAT:

1.  Randall G. Workman is substituted for Gary Gibson as the party Respondent and the Court Clerk is directed to note such substitution on the record.

2.  Petitioner's request for habeas relief (Dkt. No. 17) is denied.

3.  Petitioner's request for an evidentiary hearing, contained within his Petition, is denied.

4.  Petitioner's request to hold this matter in abeyance to allow him to exhaust his ineffective assistance of counsel claims, contained within his Petition, is hereby denied.

**It is so ordered on this  _27th_  day of September, 2010.**

James H. Payne
United States District Judge
Eastern District of Oklahoma